ESTATE OF Margaret ELLER and Loretta Eller, as Administratrix of the Estate of Margaret Eller, Plaintiffs Below, Appellants,

v.

Wayne BARTRON, Defendant Below, Appellees.

No. 643, 2010.

Supreme Court of Delaware.

Submitted: Sept. 14, 2011.
Decided: Nov. 8, 2011.

Bayard J. Snyder, Snyder & Associates, P.A., Wilmington, Delaware, for appellant.

Thomas C. Marconi, Losco & Marconi, P.A., Wilmington, Delaware, for appellee.

Before STEELE, Chief Justice, BERGER and RIDGELY, Justices.

STEELE, Chief Justice:

A real estate agent served as the seller's agent for two sales of the same house. The initial purchaser submitted a bid for the house and, the same day, hired the initial seller's agent to serve as seller's agent for the second sale. A few days later, the agent convinced the initial seller

to accept the initial purchaser's bid without disclosing his conflict of interest or the purchaser's interest in flipping the house. After one day of trial concerning the initial seller's complaint against the agent alleging, *inter alia*, a breach of fiduciary duties, the trial judge granted the defendant's motion for a directed verdict. Because the plaintiff raised issues of material fact concerning whether the defendant breached his fiduciary duties to the seller, we remand the case for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

Loretta Eller decided to sell her mother's house after her mother entered a nursing home. Acting on her mother's behalf, Eller entered into a listing agreement with Wayne Bartron, a real estate agent, on July 22, 1998. The contract awarded Bartron the exclusive right to list the house for one year, specified a sale price of $152,000, and set the commission at seven percent. The contract also included a waiver of Eller's right to object to dual agency, meaning that Eller relinquished her common law right to object to Bartron representing both her and a buyer in the sale of the house. As a result, Bartron could earn the full seven percent, rather than splitting it with a buyer's agent, if he solely found a buyer.

Several months passed uneventfully, then a flurry of activity occurred during January, 1999. On January 20, 1999, Bartron showed the house to Brian Pierce, a person Bartron knew to be a real estate investor. Pierce was part owner of Pierce/O'Neill Ltd., a firm that purchases real estate at distressed prices in the hope of quickly reselling it for a profit. Two days later, Pierce/O'Neill made a $96,000 offer, in writing. Bartron read his notes from that day into evidence:

O'Neill/Pierce made an offer with stipulation they can access prior to settlement for repairs and showings. Loretta agreed with the condition that she/I be there for all entry.... O'Neill/Pierce signed contract with a promise to list with me for a reduced commission to solve problems with entry prior to.

After a brief delay, Eller signed the contract on January 28. She testified that she only decided to accept the offer after a conversation Bartron initiated, at her house, after work hours.

As Bartron's notes indicate, the same day Pierce/O'Neill made an offer to Eller, Pierce/O'Neill engaged Bartron to serve as Pierce/O'Neill's agent for reselling the property. Bartron arranged for Wayne Knierim, a potential buyer who knew Pierce socially, to tour the property. Knierim entered into a contract on January 27 to purchase the house from Pierce/O'Neill, for $130,000. Section 11 of that contract stated that Pierce/O'Neill sold the property "as is." But Knierim testified that he entered into a handshake agreement with Pierce, obligating Pierce/O'Neill to both foot the bill for some repairs to the house and also provide raw materials for Knierim to use to accomplish other improvements. Knierim testified that he would not have paid the $130,000 if Pierce/O'Neill had not agreed to this other help.

On March 30, 1999, the settlements for both sales occurred in the same law firm. The first sale consummated that day transferred the house from Eller's mother to Pierce/O'Neill; the next sale transferred it from Pierce/O'Neill to Wayne Knierim.

Months later, a realtor who happened to notice that Eller's mother's house was sold twice on the same day mentioned that oddity to Eller. After learning of the second sale, Eller filed a suit against Bartron that alleged a number of claims, including a breach of fiduciary duty.

At trial, Eller testified that Bartron never told her that he had agreed to sell the house on behalf of Pierce/O'Neill. Nor, she testified, did Bartron inform her about the second sale. Eller testified that she only learned the house was sold a second time on the same day because a realtor thought it was odd, and so mentioned the second sale to Eller when the two happened to speak some months later.

Other factual disputes arose at trial. First, Eller contended that Bartron knew about the January 27 contract on January 28, when he convinced Eller to sign the offer. Eller could offer no specific evidence supporting this contention, instead she relied on the nature of the relationship between Bartron and Pierce/O'Neill to support a finding that Bartron knew of the contract. Despite the circumstances underlying the Bartron and Pierce/O'Neill relationship, the trial judge found that Eller put forward no particular evidence sufficient to create a dispute about a genuine issue of material fact in the face of Bartron's direct testimony that he did not know about the January 27 contract on January 28.

Second, Eller contended that the two transactions cheated her out of the difference between the two sales prices. Bartron introduced evidence suggesting, to the contrary, that the price difference reflected Pierce/O'Neill's willingness to finance some renovations to the house.

After a one day trial, the trial judge issued an oral order granting the defendant's motion for a directed verdict. Although Eller's complaint asserted that Bartron breached his fiduciary duty, the trial judge's oral order included no specific findings about that claim. The trial judge concluded that the existence of Bartron's notes "does necessarily indicate that he told her that he was working with [Pierce/O'Neill]."[1]

## STANDARD OF REVIEW

■ We review a trial judge's decision on a motion for a directed verdict to determine "whether the evidence and all reasonable inferences that can be drawn therefrom, taken in a light most favorable to the nonmoving party, raise an issue of material fact for consideration by the jury."[2]

## DISCUSSION

■ To establish liability for the breach of a fiduciary duty, a plaintiff must demonstrate that the defendant owed her a fiduciary duty and that the defendant breached it.[3] Because Bartron acted as Eller's agent, and therefore owed her traditional fiduciary duties, the trial judge should have permitted the jury to determine whether Bartron breached his fiduciary duties, and if so, what damages proximately resulted from the breach.

A real estate agent is the agent of his clients. As a general matter, "[a]gency is the fiduciary relationship that arises when a person (a 'principal') manifests assent to another person that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."[4] Bartron and Eller manifested the neces-

---

1. Tr. at 180.

2. *Burkett–Wood v. Haines*, 906 A.2d 756, 762 (Del.2006) (quoting *Fritz v. Yeager*, 790 A.2d 469, 471 (Del.2002)); *see also Moody v. Nationwide Mut. Ins. Co.*, 549 A.2d 291, 293 (Del.1988).

3. *Heller v. Kiernan*, 2002 WL 385545, at *3 (Del.Ch. Feb. 27, 2002) (citing *York Linings v. Roach*, 1999 WL 608850, at *5 (Del.Ch. Jul. 28, 1999)).

4. Restatement (Third) Agency, § 1.01 (2006).

sary assent by signing the listing contract. Delaware courts consider real estate agents to be agents as recognized at common law.[5] A typical person depends on the experience and knowledge of a real estate agent to help arrange the best transaction possible concerning what may often be the most important asset a person owns.

The existence of an agency relationship empowers an agent to act on behalf of his principal. When accompanied by trust that the agent will use the principal's confidential information to pursue the principal's ends, that relationship also imposes fiduciary duties on the principal.

Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior.[6]

To protect the social gains resulting from fiduciary relationships, the courts, in appropriate circumstances, afford a remedy to those parties whose trust has been unlawfully abused, often referred to as the "exclusive benefit" rule, which unless modified by contract "flatly forbid[s]" fiduciaries from gaining personally from the agency relationship.[7]

▪▪ Agents owe their principals a duty to disclose certain information, and a duty to avoid gaining an interest adverse to their principal.

It is true, of course, that under elemental principles of agency law, an agent owes his principal a duty of good faith, loyalty and fair dealing. Encompassed within such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him. There is also a corollary duty of an agent not to put himself in a position antagonistic to his principal concerning the subject matter of his agency.[8]

An agent who acquires a position adverse to the principal, but fails to disclose it, simultaneously breaches the duties of loyalty and care.[9]

The evidence developed after one day at trial created genuine, disputed issues of material fact about whether Bartron breached his fiduciary duties. First, the evidence at trial created an issue about whether Bartron informed Eller that Pierce/O'Neill's bid for her property was accompanied with a promise that Pierce/O'Neill would use Bartron as its listing agent to sell the property. An agent cannot accept another agency that creates tension with an earlier agency unless he first informs the principal and receives the

---

**5.** *Johnson v. Chupp*, 2003 WL 292168, at *2 (Del.Super.Feb. 11, 2003) ("It is true that where a real estate firm has agreed to act on behalf of a buyer in presenting a contract for purchase of real property, an agency relationship arises."); *Petenbrink v. Superior Home Builders, Inc.*, 1999 WL 1223786, at *3 (Del.Super.Nov. 1, 1999) ("Real estate brokers and salesman are fiduciaries, who are charged with full disclosure of all material facts to those who repose confidence in them.") (quoting *Stella v. Del. Real Estate Comm'n*, 1986 WL 3642, at *4 (Del.Super.Mar. 6, 1986)).

**6.** *Meinhard v. Salmon*, 249 N.Y. 458, 464, 164 N.E. 545 (N.Y.1928).

**7.** Iman Anabtawi & Lynn Stout, *Fiduciary Duties for Activist Shareholders*, 60 Stan. L.Rev. 1255, 1263 (2008).

**8.** *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del.1980) (citations omitted).

**9.** *See Triton Const. Co., Inc. v. Eastern Shore Elec. Servs., Inc.*, 2009 WL 1387115 (Del.Ch. May 18, 2009).

principal's consent. If an agent "acts for more than one principal in a transaction," he must "disclose to each principal ... all other facts that the agent knows, has reason to know, or should know would reasonably affect the principal's judgment unless the principal has manifested that such facts are already known by the principal or that the principal does not wish to know them." [10] This requirement ensures that the principal will have "a focused opportunity to assess risks" once the agent identifies potentially problematic circumstances. [11]

Bartron's failure to explain his dual agency role to Eller prevented her from having an opportunity to assess her risks. Bartron's agreement to act as the seller for Pierce/O'Neill's second transaction affected the weight Eller should assign to his views, so Bartron had a duty to refuse to act for Pierce/O'Neill until he informed Eller of his opportunity to benefit and secured Eller's consent. When Eller consented to dual agency, she consented only to Bartron representing her and the buyer in a single transaction. She would have reasonably expected Bartron to sell the house at a price approximating fair market value. She reasonably could have objected to Bartron, as her agent, representing the buyer's resale so quickly as detrimental to her receiving the highest available price in the initial sale. The agent's loyalty to both parties, coupled with the fact that the second sale enhances the returns from the agent's commissions, suggests that Eller would be worried about her price reflecting real market value. But if the real estate agent agrees to sell that same property a second time on behalf of the prospective buyer, the agent faces a set of incentives that can destroy the agent's incentives to get the best deal for the initial seller. An agent who stands to earn a second commission on the same property, immediately, has reason to make sure that the prospective buyer secures the property. The commission that he would stand to earn from a second sale could typically more than compensate him for a lower commission in the first transaction. Eller should have had a focused opportunity to assess whether she would permit an agent with those arguably competing interests to act on her behalf.

Eller's contractual consent to Bartron representing her and a buyer's interest in a single sale does not remove Bartron's duty to fully disclose his January 22 agreement to serve as Pierce/O'Neill's agent to resell the house. A real estate agent who accepts a dual agency represents both the seller and the agent in a single transaction. On January 28, when Bartron convinced Eller to accept Pierce/O'Neill's offer even though it was significantly beneath the price she expected, Eller did not know she was dealing with a conflicted advisor. Eller thought Bartron expected to receive a commission as the seller's agent and one as the buyer's agent. She did not know he also expected to receive another commission—as the seller's agent for an immediate resale of the same property. Therefore, Eller did not consent to a situation where she might reasonably expect Bartron to recommend she sell the property for less than his estimate of its market value.

---

**10.** Restatement (Third) of Agency § 8.06(2)(b)(ii); *Triton*, 2009 WL 1387115, at *14 ("Agents owe a duty to disclose relevant information if they have notice of facts which they should know may affect the decisions of their principals as to their conduct. The duty to disclose arises in situations where an agent has, or represents another who has, interests adverse to the principal concerning matters within the scope of the agency.").

**11.** *Id.*

Second, Bartron should have told Eller that Pierce/O'Neill planned to immediately resell the house. The seller of a house, a person interested in receiving the best possible price for the property, would want to know if the purchaser planned to flip the house. That information would at least suggest that the house could be sold for a higher price. Eller testified that Bartron did not tell her that Pierce/O'Neill planned to attempt to resell Eller's mother's house before her sale to Pierce/O'Neill even closed. Bartron's notebook offers evidence that he told Eller about this plan. But the conflict between Bartron's notebook and Eller's testimony creates a genuinely disputed issue about a material fact. The jury should have resolved the issue of whether Bartron told Eller Pierce/O'Neill planned to flip the property.

Factual arguments advanced by Bartron's counsel misconceive the problem with Bartron's behavior. For instance, it does not matter that Eller put forward no particular facts suggesting that Bartron knew O'Neill/Pierce had signed a contract with Knierim when it happened. Had facts suggested that Bartron knew of the January 27 contract while he was persuading Eller to sign the offer on January 28, his violation of the duty of loyalty would have been patently obvious. But even assuming that Bartron did not know of the contract between Knierim and Pierce/O'Neill, Bartron still should have told Eller of his conflict of interest and of Pierce/O'Neill's intent to resell the house.

Similarly, the argument that the higher price in the second sale was justified be- cause a handshake deal between Pierce/O'Neill and Knierim explained the price increase misses the point. Financial support given from Pierce/O'Neill to Knierim only demonstrates that Pierce/O'Neill's profits from the two sales might be less than is suggested by the difference between the first and second sale prices. That Pierce/O'Neill might have made a smaller profit than the facts at first suggest does not affect whether Bartron should have told Eller about those two points. In any event, a jury need not credit Knierim's testimony that a handshake deal existed. Since Pierce/O'Neill, an experienced real estate investment firm, bargained for the contractual right to receive payment without improving the property in any way, a reasonable jury could very well consider the contractual language to be a better guide to the content of the deal than the contradictory testimony.

This opinion, premised on the common law of agency as it has evolved over the course of centuries, will soon provide little guidance to real estate agents. The other branches of Delaware's government have enacted a scheme of statutory agency for real estate agents that takes effect in early 2012.[12] The new act does not entirely foreclose the possibility that this opinion will be relevant again in the future, since, at least as a formal matter, the new act permits members of the public to hire a real estate agent as a common law agent.[13] But most of the new act is devoted to a lengthy description of a new form of statutory agency that displaces the common law of agency.[14] This opinion does not resolve

---

**12.** 78 Del. Laws ch. 166, § 2 (2011) (stating that the act goes into force six months after August 3, 2011).

**13.** *See* 78 Del. Laws ch. 166, § 1 (2011) (amending 24 *Del. C.* § 2932 to permit consumers to enter into a Common Law Agent relationship with a broker if both parties so

agree; that relationship will be governed by the common law of agency "to the extent it is not inconsistent with applicable provisions of this chapter.").

**14.** *See* 78 Del. Laws ch. 166, § 1 (2011) (amending 24 *Del. C.* § 2933 to replace the common law of agency with statutory agency

whether the duties of a statutory agent, as discussed in the new law, would lead to the same outcome as the common law.

and explaining that this subchapter completely displaces the common law for persons in a

## CONCLUSION

We reverse the judgment of the Superior Court and remand for a new trial.

relationship governed by statutory agency).