**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ZENITH ENERGY TERMINALS | ) | |
| JOLIET HOLDINGS LLC, a Delaware | ) | |
| Limited Liability Company, JOLIET | ) | |
| BULK, BARGE & RAIL LLC, a | ) | |
| Delaware Limited Liability Company, | ) | |
| | ) | |
| Plaintiffs, | ) | C.A. No.: N19C-10-054 EMD CCLD |
| | ) | |
| v. | ) | |
| | ) | |
| CENTERPOINT PROPERTIES TRUST, | ) | |
| a Maryland Real Estate Investment Trust, | ) | |
| | ) | |
| Defendant. | ) | |

**DECISION AFTER TRIAL**

Submitted: March 12, 2024
Decided: July 29, 2024

Christopher Viceconte, Esquire, Gibbons P.C., Wilmington, Delaware, Patrick J. Lamb, Esquire, J'Aimee Crockett, Esquire, ElevateNext Law, Chicago, Illinois. *Attorneys for Plaintiffs Zenith Energy Terminals Joliet Holdings LLC and Joliet Bulk, Barge & Rail LLC.*

F. Troupe Mickler IV, Esquire, Randall J. Teti, Esquire, Ashby & Geddes, P.A., Wilmington, Delaware, James D. Dasso, Esquire, Mason D. Roberts, Esquire, Jennifer S. Park, Esquire, Zachary R. Kumar, Foley & Lardner LLP, Chicago, Illinois. *Attorneys for Defendant CenterPoint Properties Trust.*

**DAVIS, J.**

## I. INTRODUCTION

This is a breach of contract action assigned to the Complex Commercial Litigation

Division of this Court. Plaintiffs Zenith Energy Terminals Joliet Holdings LLC ("Zenith") and

Joliet Bulk, Barge & Rail LLC ("JBBR") (collectively, "Zenith" or the "Plaintiffs") filed an

Amended Complaint on September 10, 2021, against Defendants CenterPoint Properties Trust ("CenterPoint" or the "Defendant") for breach of contract.[1]

CenterPoint previously owned JBBR.[2] CenterPoint, through JBBR, entered into contracts to design and build a crude-by-rail off-loading terminal in Joliet, Illinois (the "Terminal").[3] CenterPoint planned that the Terminal would receive, off-load, store, and distribute crude oil from the Mojo Pipeline.[4]

CenterPoint and Arc Terminals Joliet Holdings LLC (now known as Zenith Terminals Joliet Holdings LLC) entered into a Membership Interest Purchase Agreement (the "Purchase Agreement").[5] Under the Purchase Agreement, CenterPoint sold JBBR and, in effect, the Terminal to Zenith before the construction project on the Terminal was completed.[6] Thereafter, Zenith, on behalf of JBBR, and CenterPoint negotiated a Construction Management Agreement, whereby CenterPoint was to continue to manage the construction project.[7] Ultimately, the construction project was incomplete, not meeting alleged key requirements under the design and build plans.[8]

Zenith filed suit, alleging CenterPoint breached the Purchase Agreement and the Construction Management Agreement. CenterPoint maintains no such breaches occurred.

## II.     PROCEDURAL BACKGROUND

On October 7, 2019, Zenith filed its original Complaint, asserting (1) breach of contract against CenterPoint under the Purchase Agreement between Zenith and CenterPoint, and (2)

---

[1] Amended Complaint ("Am. Compl."), Sept. 10, 2021 (D.I. No. 89).
[2] *See id.* ¶ 4.
[3] *Id.* ¶ 3.
[4] *Id.* ¶ 1.
[5] *Id.* ¶ 4.
[6] *Id.*
[7] *Id.* ¶¶ 4-5.
[8] *Id.* ¶ 6.

breach of contract against CenterPoint under the Construction Management Agreement between JBBR and CenterPoint.[9]  On November 9, 2019, CenterPoint filed its first Motion to Dismiss, or, in the Alternative, Motion to Stay the Action Pending Resolution of the Related Litigation (the Motion to Dismiss").[10]  On January 28, 2020, the Court heard argument on the Motion to Dismiss.[11]  On February 14, 2020, the Court denied the Motion to Dismiss.[12]  On February 21, 2020, CenterPoint filed its Answer and Affirmative Defenses.[13]

On August 27, 2021, Zenith filed a Motion to Amend the Complaint under Delaware Superior Court Civil Rule 15(a),[14] which the Court granted on September 9, 2021.[15]  Zenith filed the current Amended Complaint on September 10, 2021, which asserts the same two breach of contract counts as the original Complaint.[16]  CenterPoint thereafter filed its Answer and Affirmative Defenses on September 24, 2021.[17]  CenterPoint then filed a Motion to Amend the Answer (the "Motion to Amend") to assert counterclaims on the same day.[18]  The Court heard argument on the Motion to Amend on October 18, 2021,[19] and denied the Motion to Amend on January 7, 2022.[20]

On August 5, 2022, Zenith filed a Motion for Summary Judgment, seeking judgment in its favor on both counts as to liability and requesting a trial as to damages.[21]  Also on August 5, 2022, CenterPoint filed its own Motion for Summary Judgment, requesting judgment in its favor

---

[9] *See* Original Complaint ("Original Compl."), Oct. 7, 2019 (D.I. No. 1).
[10] *See* Defendant's First Motion to Dismiss ("First Mot. to Dismiss"), Nov. 19, 2019 (D.I. No. 9).
[11] *See* Judicial Action Form, Jan. 28, 2020 (D.I. No. 25).
[12] *See* Order, Feb. 14, 2020 (D.I. No. 27).
[13] *See* Answer, Feb. 21, 2020 (D.I. No. 28).
[14] *See* Motion to Amend Complaint, Aug. 27, 2021 (D.I. No. 86).
[15] Order, Sept. 9, 2021 (D.I. No. 88).
[16] *See* Am. Compl.
[17] *See* Answer, Sept. 24, 2021 (D.I. No. 90).
[18] *See* Motion to Amend Answer, Sept. 24, 2021 (D.I. No. 91).
[19] *See* Judicial Action Form, Oct. 18, 2021 (D.I. No. 94).
[20] *See* Order, Jan. 27, 2022 (D.I. No. 105).
[21] *See* Plaintiffs' Motion for Summary Judgment ("Pls.' Mot. for Summ. J.") (D.I. No. 131).

on both counts in the Amended Complaint.[22]  The Court heard argument on those Motions on October 28, 2022 and took the Motions under advisement at the conclusion of the hearing.  The Court denied the Motions for Summary Judgment on January 23, 2023 (the "Opinion").[23]

The Opinion resolved substantially all of the legal issues between the parties.  The Court held that Delaware's applicable statute of limitations did not bar Zenith's breach of contract claims—*i.e.*, Count I and Count II.[24]  The Court also addressed issues of contract interpretation.  The Court held that the Purchase Agreement and the Construction Management Agreement were unambiguous.[25]  The Court will not readdress these legal issues as part of this Decision.  The Court notes that nothing presented during the Trial (as defined below) would cause the Court to change any holding as to a legal issue addressed in the Opinion—*e.g.*, that the statute of limitations bars Zenith's claim or that the contracts were ambiguous.  Finally, the Court found that genuine issues of material fact existed as to: (i) "Final Completion;"[26] (ii) whether CenterPoint breached Purchase Agreement Section 6.16(a);[27] and (iii) whether CenterPoint breached Construction Management Agreement Section 2(b).[28]

### III.    THE TRIAL

The Court held a bench trial on Zenith's claims from July 5, 2023 through July 7, 2023 and again on August 21, 2023 (collectively, the "Trial").[29]  The Court then had both parties

---

[22] *See* Defendant's Motion for Summary Judgment ('Def.'s Mot. for Summ. J.") (D.I. No. 139).
[23] *Zenith Energy Terminals Joliet Holdings LLC v. CenterPoint Properties Trust*, 2023 WL 615997 (Del. Super. Jan. 23, 2023).
[24] *Id*. at *8-9.
[25] *Id*. at *9-11.
[26] *Id*. at *12 ("Final Completion" as defined below).
[27] Id. at *11-12.
[28] Id. at *12-14.
[29] Civil Trial Activity Sheet (D.I. No. 186).

submit their closing arguments in written form, receiving the final post-trial paper on or about November 20, 2023.[30]  The Court then held closing arguments on November 28, 2023.[31]

### A. WITNESSES

During the Trial, the Court heard from and considered testimony from the following witnesses:

Gavin Palmer
Tony Henshaw
Ira Hanan
Douglas Haduch
Steven Schnitzer
Eric Gilbert
Michael Murphy
Robert David Vinson

All the witnesses testified on direct and were available for cross-examination.  The fact witnesses in this civil action were Mr. Haduch, Mr. Schnitzer, Mr. Gilbert and Mr. Murphy.  The expert witnesses were Mr. Palmer,[32] Mr. Henshaw,[33] Mr. Hanan[34] and Mr. Vinson.[35]  The parties agreed not to admit the various expert reports into evidence.

Normally, the Court would list the witnesses in the order they testified and which party called the witness; however, because the Trial was a bench trial, the Court could take witnesses out of order.  In addition, the Court allowed for examination of each witness in both parties' case-in-chief pursuant to Delaware Evidence Rule 611.

Brian Sheehan, CenterPoint's appointed Construction Manager for JBBR, did not testify at the Trial.  No representatives from Ragnar Benson Construction LLC ("Ragnar") or Wilson &

---

[30] D.I. No. 201.
[31] D.I. No. 202.
[32] Mr. Palmer testified and rendered his opinions on July 5, 2023.
[33] Mr. Henshaw testified and rendered his opinions on July 5, 2023.
[34] Mr. Hanan testified and rendered his opinions on July 5, 2023.
[35] Mr. Vinson testified and rendered his opinions on August 21, 2023.

Company, Inc. Engineers & Architects ("Wilson") testified at the Trial. Deposition testimony has been used in some instances in lieu of live testimony.

### B. CREDIBILITY OF WITNESSES

Here, the Court is the sole judge of each witness's credibility, including the parties.[36] The Court considers each witness's means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.[37]

The Court finds that—based on their testimony at the Trial and the factors listed above—the witnesses that testified were generally credible. All witnesses had some form of relationship to the parties and the Court accounted for that bias. The Court, however, believes that the witnesses were not evasive, nor did they provide testimony that was not somehow supported by other evidence. While the Court finds that the witnesses were generally credible, the Court gave more weight to some testimony based on evidence supporting that testimony. For example, the Court found Mr. Vinson to be credible but did not give his testimony as much weight as other experts due to certain evidentiary facts regarding Mr. Sheehan's conduct.

### C. EXHIBITS

The parties submitted an extensive number of exhibits. Most of these exhibits were admitted without objection. The parties provided the Court with the exhibits in the form of joint exhibits ("JX"). The exhibits numbered JX1-1511.

---

[36] *See* Superior Court Civil Pattern Jury Instruction 23.9.
[37] *Id.*

## IV.    FACTUAL FINDINGS

### A. THE PARTIES

Zenith is a Delaware limited liability company formerly named Arc Terminals Joliet Holdings LLC ("ARC").[38]  Arc contracted with CenterPoint under the Purchase Agreement to purchase JBBR.[39]  As stated above, JBBR controls the Terminal.  To avoid confusion, the Court will refer to Zenith in this Decision, but the Court (and the parties) consider Arc and Zenith to be the same entity.

CenterPoint is a "Maryland real estate investment trust" that "acquires, develops, manages and leases warehouse, distribution and manufacturing facilities near major transportation nodes and is an expert in large rail infrastructure assets."[40]  CenterPoint was the owner of the Terminal prior to the execution of the Purchase Agreement.[41]  Additionally, CenterPoint managed the continuing construction of the Terminal post-sale under the Construction Management Agreement.[42]

JBBR is a Delaware limited liability company formed by CenterPoint on or around November 9, 2011.[43]  CenterPoint, through JBBR, negotiated contracts to design and construct the Terminal.[44]  JBBR has owned the Terminal and, by extension, the construction project at all times relevant to this action.[45]  On May 14, 2015, CenterPoint sold JBBR to Zenith (still known as Arc Terminals at the time) under the Purchase Agreement.[46]

---

[38] *Id.* ¶ 8.
[39] *Id.*
[40] *Id.* ¶ 10.
[41] *Id.* ¶¶ 2-4; *see also* Pls.' Mot. for Summ. J. at 2.
[42] Am. Compl. ¶ 4.
[43] *Id.* ¶ 9; Pls.' Mot. for Summ. J. at 2.
[44] Pls.' Mot. for Summ. J. at 3; Def.'s Mot. for Summ. J. at 5.
[45] Am. Compl. ¶ 9.
[46] *Id.* ¶ 11.

## B. PLANNING AND DEVELOPMENT OF THE TERMINAL

In 2013, CenterPoint determined to develop land it owned into a crude-by-rail offloading facility.[47] CenterPoint began this process by engaging Wilson to design the facility. On April 16, 2014, Wilson and JBBR entered into a Master Services Agreement ("MSA").[48] The MSA tasked Wilson with providing design, engineering, and construction oversight on the construction project.[49] Additionally, Wilson entered into various task orders that provided details on the scope of work for the construction project.[50]

CenterPoint then engaged in negotiations with ExxonMobil Oil Corporation ("Exxon").[51] Exxon owned and operated an oil refinery near CenterPoint's development site.[52] On May 28, 2014, JBBR and Exxon entered into the Terminal Services Agreement (the "TSA").[53] JBBR was then a wholly owned entity of CenterPoint.

The TSA was a "take or pay" contract, meaning Exxon was required to make regular minimum payments even if Exxon did not need a specified number of trains unloaded for the requisite period.[54] TSA Section 7.5 provides: "[Exxon] shall be obligated to pay the Monthly Committed Payment…regardless of whether [Exxon] in fact delivers all or any of the Committed Volume…."[55]

The TSA required that the Terminal be available at all times except "short periods of time due to routine maintenance and repair."[56] Mr. Gilbert testified that an "essential element" of the

---

[47] Aug. 21 Tr. 9:4-16.
[48] JX3.
[49] *Id.*
[50] *Id.*
[51] Aug. 21 Tr. 9:17-10:7.
[52] *Id.*
[53] JX25.
[54] *Id.* §7 ("Volume and Fees") and §7.5.
[55] *Id.* § 7.5.
[56] *Id.* § 2.8.

TSA was the Terminal's capability to steam and unload a unit train (120 railcars) within 24 hours, including that part of the year between October 1 and March 31.[57]

On August 26, 2014, Ragnar and JBBR entered into a Construction Contract.[58] Under the Construction Contract, Ragnar was the engineering, procurement, and construction contractor on the construction project.[59] Ragnar purportedly "agreed to construct the Terminal in conformity with [s]pecifications and the provisions of the Construction Contract."[60]

## C. THE PURCHASE AGREEMENT AND THE CONSTRUCTION CONTRACT

Shortly after entering the Construction Contract, however, CenterPoint decided to sell the Terminal.[61] CenterPoint hired Wells Fargo to broker the sale and considered several prospective purchasers.[62]

Zenith sought to purchase the Terminal. CenterPoint did not accept Zenith's initial proposal to purchase the Terminal. However, after CenterPoint failed to obtain a better purchase proposal CenterPoint re-engaged with Zenith.[63] On December 14, 2014, Zenith submitted a letter of intent to acquire the membership interests of JBBR from CenterPoint.[64]

On February 19, 2015, after a brief due diligence period, Zenith and CenterPoint entered into the Membership Interest Purchase Agreement—*i.e.*, the Purchase Agreement.[65] Zenith purchased JBBR from CenterPoint for $216 million, plus $27 million in deferred payments, for

---

[57] Aug. 21 Tr. 44:16-45:19.
[58] JX1.
[59] *Id.*; JX2.
[60] Def.'s Mot. for Summ. J. at 8-9.
[61] *Id.* 22:1-23:21.
[62] *Id.* 22:1-23:21; 24:2-8.
[63] *Id.* 24:2-8.
[64] JX19.
[65] JX20.

an aggregate amount of $243 million.[66]  The parties completed closing on May 14, 2015.[67]  On

May 14, 2015, therefore, Zenith became JBBR's parent company.[68]

The Terminal was still under construction when Zenith and CenterPoint entered into the

Purchase Agreement.[69]  Zenith had no experience with the construction of a project like the

Terminal.[70]  Moreover, Zenith had no prior relationship with Ragnar or Wilson.[71]  CenterPoint

had the needed construction experience and relationships with critical vendors.[72]  The parties

memorialized this in Section 6.15(a) of the Purchase Agreement, titled "Final Completion,"

which states:

> After Closing, on and subject to the terms of the Construction Contract [with Ragnar] and the Construction Management Agreement, [CenterPoint] shall use its ***reasonable best efforts*** to achieve, and to cause the EPC Contractor [Ragnar] (and any other applicable third party contractors or service providers) to achieve, Final Completion in accordance with the Approved Cost Plan and the Project Schedule and otherwise in accordance with the terms and conditions of the Construction Contract and the Construction Management Agreement in all material respects.[73]

In the Purchase Agreement, "Final Completion" is defined as "the meaning given in the

Construction Contract."[74]  The Construction Contract between JBBR and Ragnar, dated August

26, 2014, defines "Final Completion" as:

> [T]hat point in time in the progress of the Work after Mechanical Completion when (a) the Work has been completed and is operational; (b) all testing (including hydrotesting) and coating is complete; (c) all pipe, valves, and Equipment installation and tie-ins are complete; (d) all essential Equipment and lines have been hydrotested and had a geometry tool run through them; (e) the Work is capable of transporting refined products in a safe uninterrupted manner 24 hours per day, seven days per week without further anticipated shutdowns, except for preventative maintenance; (f) and all other requirements of this [Construction Contract] with

---

[66] Am. Compl. ¶ 4; JX20.
[67] JX29.
[68] Pls.' Mot. for Summ. J. at 11; Def.'s Mot. for Summ. J. at 5.
[69] JX20; JX5.
[70] Cubbage Dep. 33:2-34:24; 103:22-104:23.
[71] *Id.*
[72] Aug. 21 Tr. 27:19-28:18.
[73] JX20 § 6.15(a) (emphasis added).
[74] *Id.* at Annex I.

respect to Final Completion ([including those set forth in Construction Contract Exhibit A]) have been satisfied.[75]

The Construction Contract defines "Work" to

[M]ean all of [Ragnar's] obligations, duties and responsibilities under this [Construction Contract], including the design, engineering, procurement, manufacturing, supply, installation, erection, construction, commissioning, and testing of the Facilities, all work and services described in Exhibit A and all Warranty Work."[76]

Exhibit A of the Construction Contract sets out the "Minimum Requirements for Final Completion" and defines them as:

(a) Final Completion includes, at a minimum, the following: (i) any liquidated damages payable by [Ragnar] to [JBBR] pursuant to th[is Construction Contract] have been paid and/or satisfied; (ii) [Ragnar] has completed all the Work required by this [Construction Contract]; (iii) [Ragnar] has executed and delivered to [JBBR] and [JBBR] has accepted the lien waiver . . .; (iv) [Ragnar] has provided the final close-out report to [JBBR]; (v) there are no outstanding claims or disputes as between [Ragnar and JBBR]….[77]

Exhibit A additionally required that "any liquidated damages payable by Contractor to Company pursuant to the Agreement have been paid and/or satisfied" and that "there are no outstanding claims or disputes between the Parties."[78]

The Construction Contract also required Final Lien Waivers from the Contractor and all subcontractors be provided to and accepted by JBBR before Final Completion was achieved.[79]

### D. THE CONSTRUCTION MANAGEMENT AGREEMENT

In tandem with the Purchase Agreement, Zenith and CenterPoint executed the Construction Management Agreement on May 14, 2015.[80] The Construction Management

---

[75] Am. Compl., JX1 § 1.1.
[76] Id. § 1.1 (underlining in original).
[77] *Id.* at Ex. A.
[78] *Id.*
[79] *Id.* at Ex. E.
[80] JX6.

11

Agreement made CenterPoint the agent of JBBR,[81] and it states that "[JBBR] has requested that [CenterPoint] provide certain construction management services to [JBBR] . . . for a limited period following the Closing Date, and [CenterPoint] has agreed to provide such services."[82]

Construction Management Section 2(a), titled "Construction Management Services," states:

> Subject to the terms of this Agreement, [CenterPoint] agrees to provide to [JBBR] and [JBBR] agrees to accept from [CenterPoint], the construction management services described on <u>Schedule A</u> . . .. [JBBR] hereby (i) [appoints CenterPoint as its agent for all purposes] under the Construction Contract [and CenterPoint accepts], and (ii) authorizes [CenterPoint] to take all actions on behalf of [JBBR] that [CenterPoint], in [CenterPoint]'s sole and good faith discretion, considers reasonably necessary to provide the Services, including all invoices, payments, change orders and certifications under the Construction Contract; provided that [CenterPoint] shall (A) obtain [JBBR]'s prior written consent (which shall not be unreasonably withheld, conditioned or delayed) before (1) issuing the Final Completion Certificate (as defined in the Construction Contract) and making payment therefor.[83]

Construction Management Agreement Schedule A states that "[CenterPoint] shall manage EPC Contractor's [Ragnar's] performance and completion of the Work under the Construction Contract until the Final Completion Certificate is issued and accepted by [JBBR] thereunder and payment is made therefor."[84]

Construction Management Section 2(b) is also referenced. Section 2(b) provides:

> [CenterPoint] shall perform the Services with substantially the same standard of care (including quality) as the Services were performed by or on behalf of [JBBR] prior to the Effective Date, including, without limitation, by performing the Services, at all times, as would a reasonably prudent construction manager in the construction management industry.[85]

---

[81] *Id.*

[82] *Id.* at Recitals.

[83] *Id.* § 2(a) (underlining in original).

[84] *Id.* at Schedule A.

[85] *Id.* § 2(b).

Construction Management Agreement Section 2(h) limits the obligations under Section 2, and it provides that "except as expressly set forth in Section 2, no representations, warranties or guaranties of any kind, express or implied . . . are made by [CenterPoint] with respect to the services provided under [the Construction Management Agreement]," and that all representations and warranties are waived and disclaimed to the fullest extent of the law.[86]

### E. EVENTS AFTER EXECUTION OF THE AGREEMENTS AT THE TERMINAL

#### 1. Final Completion was not achieved.

The record on Final Completion is one created by JBBR and CenterPoint. CenterPoint's decision (and contractual right)[87] to litigate its issues with JBBR in Delaware and not participate in the Illinois Action[88] means that the participation of Ragnar and Wilson was, at best, limited. From the record at Trial, the Court finds, by a preponderance of the evidence, that Final Completion was never achieved by Ragnar.

JBBR and Ragnar certified and agreed that conditions for Mechanical Completion had been satisfied. On April 30, 2015, JBBR and Ragnar signed the Mechanical Completion Certificate.[89] The Mechanical Completion Certificate provides that all conditions for Mechanical Completion had been satisfied.[90] In addition, the Mechanical Completion Certificate provided:

> Notwithstanding the issuance of the issuance of this Mechanical Completion Certificate, [Ragnar] shall not be relieved of any obligations under the [Construction Contract] or at law that survive the issuance of this Mechanical Completion Certificate.[91]

---

[86] *Id.* § 2(h).
[87] JX6 § 11(h); JX20 § 12.10(a).
[88] The Illinois Action is defined and discussed below.
[89] JX5.
[90] *Id.*
[91] *Id.*

13

The Construction Contract initially required Final Completion to be achieved by March 15, 2015.[92] Ragnar first requested to extend the date to July 1, 2015.[93] Ragnar then asked to extend Final Completion until September 30, 2015.[94] Ragnar finally asked to extend the Final Completion Date until October 16, 2015.[95] JBBR (through CenterPoint) approved each of Ragnar's requests.

The change order submitted by Ragnar, approved by CenterPoint and then by JBBR, cited the lack of trains as one reason for extending the Final Completion date.[96] Specifically, the October 9, 2015 request from Pablo M. Hernandez of Ragnar reads as follows:

> Dear Eric [Gilbert],
>
> JBBR's executed Change Order Request #15 previously extended the dates for Mechanical Completion to April 16, 2015 and for Final Completion to July 1, 2015. In accordance with the aforementioned change order request, Mechanical Completion was achieved on April 16, 2015. However, due to several factors beyond Ragnar Benson's control, we are hereby requesting an extension to the Date for Final Completion from July 1, 2015 to October 16, 2015.
>
> Factors which contributed to the delayed Date for Final Completion include, but are not limited to the following:
>
> • Delays in Train Schedules.
> Start-up and commissioning were completed in order to satisfy Mechanical Completion, however, certain items required additional commissioning efforts beyond the first couple of trains. The delays in train schedules delayed the additional commissioning efforts which impacted the critical path for Final Completion.
>
> • Added Scope Items.
> Scope items were added to Ragnar Benson's contract which also directly affected the critical path for Final Completion. Please reference Change Order Request #17 R-2. Increased scope items included, but were not limited to, Pipeline Cathodic Protection, heat trace redesign (added pumps and structural supports) and industrial waste monitoring.[97]

---

[92] JX1460.
[93] *Id.*
[94] JX1457.
[95] JX1408.
[96] *Id.*
[97] *Id.*

14

The evidence at Trial shows that, as of October 9, 2015, Ragnar, CenterPoint and JBBR agreed that Mechanical Completion had been achieved and that Final Completion had not been achieved. The reasons why the Date of Final Completion needed to be extended were "delays in train schedules" and "added scope items."

On October 16, 2015, Ragnar delivered its request for Final Completion to Michael Murphy of CenterPoint.[98] Mr. Sheehan, CenterPoint's Construction Manager for the Terminal, forwarded the request to JBBR requesting JBBR's approval.[99]

Ragnar's certification for Final Completion was signed by Ragnar's project manager, Mr. Hernandez. Mr. Hernandez did not have personal knowledge as to the facts and executed a letter provided by David Bergstrom, Ragnar's Senior Vice President.[100]

The record reflects that Ragnar did not satisfy the Exhibit A Construction Contract's lien waiver requirement.[101] For example, Ragnar did not obtains final lien waivers from Wilson or Mechanical, Inc., the entities responsible for commissioning the steam condensate system.[102] The record also indicates that other waivers were missing as well.[103]

As Construction Manager, Mr. Sheehan would have known the identity of Ragnar's subcontractors.[104] The record is incomplete on whether Mr. Sheehan (or CenterPoint) did anything to verify the accuracy of Ragnar's representations regarding any lien waivers or any other aspect of its "Certification." Testimony indicated that CenterPoint believed that Final Completion could be achieved by completion of items on Ragnar's punch lists.[105]

---

[98] JX7.
[99] JX10.
[100] Hernandez Dep. 35:14-37:21.
[101] JX1 at Ex. A.
[102] JX8.
[103] JX150 (Ragnar informing Chicago Title Ins. Co. of missing final lien waivers).
[104] July 5 Tr. at 167:1-170:12.
[105] Aug. 21 Tr. at 40:10-15; Aug. 21 Tr. at 86:20-88:20.

Ragnar knew commissioning the steam condensate system was a prerequisite to Final Completion.[106] Final Completion, in part, means that point in time after Mechanical Completion when the "Work has been completed and is operational." Work is defined as meaning all Ragnar's obligations including commissioning and testing of the Terminal.[107]

Ragnar engaged Wilson as its subcontractor to commission the system.[108] Ragnar and Wilson entered into the MSA[109] and after agreeing to a change order, Wilson was to "provide design/engineering support of the verification/commissioning of the steam/condensate, hot oil and inbound crude systems."[110] Wilson's invoices to Ragnar indicated that commissioning was not attempted until March through May 2016—a date after Ragnar's Final Completion request.[111] As such, Ragnar should have known that commissioning was not done prior to its requesting Final Completion.

CenterPoint, as Construction Manager, [112] knew or should have known that the system had not been commissioned when Ragnar requested Final Completion.[113]

Mr. Haduch, JBBR's terminal manager, communicated to Mr. Sheehan the lack of commissioning on October 7, 2015, in an email stating Mr. Haduch believed the system had not been commissioned.[114] Moreover, on October 27, 2015, Mason Whipple, Wilson's senior project engineer who designed the steam condensate system, responded to Mr. Haduch, copying Mr. Sheehan, noting that "steam needs to be commissioned under load."[115]

---

[106] JX1§ 1.1.
[107] *Id*.
[108] JX1400.
[109] *Id*.
[110] JX151.
[111] JX1401; JX1402; Jx1403; JX1404.
[112] JX20, § 6.15(a); JX6, §2(a)-(b).
[113] July 5 Tr. at 149:12-150:6; 158:17-161:16; 166:20-167:18; 214:21-215:16.
[114] JX1180.
[115] *Id*.

There is no evidence that Mr. Sheehan notified Steven Schnitzer, JBBR's General Counsel, of the lack of commissioning before Mr. Schnitzer submitted JBBR's response to Ragnar on October 29, 2015. As such, JBBR's response to Ragnar denying the request for Final Completion necessarily focused on deficiencies with the hot oil system.[116]

Evidence at Trial shows that the Terminal did not function properly. Mr. Haduch testified that the "hot oil system was problematic essentially from the day it was commissioned" and there were "a number of seal failures on a fairly regular occurrence where these booster pumps [would] blow their seals" leaving thermal oil on the ground.[117] Moreover, the pump seals repeatedly failed on the thermal booster oil pumps.[118] Mr. Haduch also testified (and Ragnar acknowledged) that two years into operations, JBBR had to "replace the same seal that keeps failing time and time again."[119]

The record supports the conclusion that steam condensate system deficiencies were not discovered until the parties attempted to commission the system. Mr. Haduch testified the steam/condensate system had multiple issues that became apparent from its first cold weather use.[120] At an attempted offloading on February 10, 2016, he observed "poor unloading rates" because "[t]he temperature of the oil [in the railcars] wasn't hot enough, and we had just a very difficult time getting the crude oil … unloaded from the railcars."[121]

Issues with the system continued into February and March.[122] The problems involved both the condensate system and the boilers.[123] Eventually JBBR and Wilson came up with an

---

[116] JX11.
[117] Aug. 21 Tr. at 31:14-32:17.
[118] Aug. 21 Tr. at 39:18-22.
[119] Aug. 21 Tr. at 48:3-9. See also JX1125 (Ragnar acknowledging the issue but disagreeing that it applies to "Final Completion").
[120] July 6 Tr. at 50:2-5.
[121] July 6 Tr. at 50:2-5. See also JX1421.
[122] July 6 Tr. at 54:13; JX1421; July 5 Tr. at 57:4-16; JX1185; July 6 Tr. at 62:8-11; JX1117.
[123] July 6 Tr. at 65:22-66:18.

ad hoc solution where the system was fueled by a local city fire hydrant with a fire hose to use city water.[124] Despite JBBR's and Wilson's attempts at a solution, there was another train steaming failure on March 8, 2016.[125]

Another issue involved the deaerator and an oversized 10-inch butterfly valve that failed to allow proper deaeration.[126] As such, the failure to deaerate negated the benefits of chemical treatment and contributed to boiler degradation.[127] JBBR repeatedly experienced issues with the deaerator overflowing and flooding rooms, including the boiler room.[128] Attempts to address the issue with modified drains failed.[129] In addition, Wilson's design utilized rubber hoses that were not appropriate for cold weather unloading.[130]

The problems with the steam condensate system continued without resolution into 2017.[131]

The Court's factual conclusions regarding "Final Completion" are supported by the testimony of experts concerning the work done and problems with the Terminal: (i) Mr. Henshaw's testimony;[132] (ii) Mr. Hanan's testimony;[133] and (iii) Mr. Palmer testifying that Final Completion had not happened given the deficiencies in steam and condensate system, including

---

[124] July 6 Tr. at 65:22-66:18 (Mr. Haduch testified about "…going to a local city fire hydrant with fire hose and filling up this 1800-foot-long pipe with city water… so that condensate would return to our DA.").
[125] July 6 Tr. at 69:2-4; JX1187.
[126] July 6 Tr. at 71:17-72:16; JX1088.
[127] July 5 Tr. at 53:12-54:18.
[128] July 6 Tr. at 73:8-74:1-8 (flooding into area containing medium voltage cabinet cause dangerous situations); July 5 July 5 Tr. at 52:2-53:1.
[129] July 6 Tr. at 73:8-74:1-8.
[130] July 6 Tr. at 80:3-82:12.
[131] July 6 Tr. at 76:7-77:11; JX155 (notes indicating slugging and overflow issues).
[132] July5 Tr. at 100:10-133:4 (includes testimony on problems at terminal and design flaws).
[133] July 5 Tr. at 159:19-172:20 (Ragnar should not have requested a Final Completion certificate because the system had not been successfully commissioned).

the inability of the system to operate in any reliable manner.[134]  CenterPoint did not provide any expert testimony on whether Final Completion had been achieved.[135]

### 2.  *CenterPoint failed to use reasonable best efforts.*

The Court has found that Final Completion was not achieved.  The next factual question is whether CenterPoint used its reasonable best efforts to achieve or cause Ragnar to achieve Final Completion.  The Court finds, by a preponderance of the evidence, that CenterPoint failed to use reasonable best efforts.  Central to this finding is the unusual conduct of CenterPoint as agent to JBBR.  The Construction Management Agreement provides that CenterPoint is the agent of JBBR.[136]  In addition, the Construction Management Agreement states that CenterPoint needs to exercise "good faith discretion" when providing Services under this agreement.[137]

The evidence at Trial showed that CenterPoint appeared to be assisting Ragnar and Wilson instead of its principal, JBBR.  The Court could come to no other conclusion given the failure of Mr. Sheehan to testify and explain his conduct in 2015 and 2016.

CenterPoint had two separate obligations under Purchase Agreement Section 6.15: (i) to "use its reasonable best efforts" to achieve Final Completion, and (ii) to "cause the EPC Contractor [Ragnar] (and any other applicable third-party contractors or service providers) to achieve Final Completion."[138]  According to testimony, EPC Contractor means a contractor with engineering, procurement, and construction responsibilities, rather than simply construction responsibilities.[139]

Mr. Sheehan acted as the Construction Manager for the Terminal.[140]

---

[134] July 5 Tr. at 62:19-65:1.
[135] See, e.g. Aug. 21 Tr. at 147:15-21.
[136] JX6, §2(a)(i).
[137] *Id.*, §2(a)(ii).
[138] JX20 §6.15.
[139] July 5 Tr. at 154:8-155:6.
[140] Aug. 21 Tr. at 12:10-15 and 42:10-15.

Mr. Sheehan did not testify at Trial. Given this, Mr. Sheehan was not able to explain some of his conduct that came out in Trial testimony and through exhibits. Mr. Sheehan seems to have failed provided JBBR with relevant information even though he was an agent of JBBR. This seemed especially true following Ragnar's October 16, 2015 request for Final Completion. For example, Mr. Sheehan did not respond to an email on the status of commissioning but did give advice to Wilson on how to respond to that same email.[141] Mr. Sheehan failed, on JBBR's behalf, to address information Wilson provided to Mr. Sheehan that "steam needs to be commissioned under load,"[142] with Ragnar even though Ragnar claimed Final Completion.[143]

At one point, S-Mechanical informed Mr. Sheehan about problems with the hot oil system auxiliary pumps.[144] However, the record does not show Mr. Sheehan sharing that information with JBBR.[145] Moreover, Mr. Sheehan does not seem to have forwarded to JBBR information from Wilson that the condensate system was not fully operational.[146]

Mr. Sheehan had other lapses in communication and apparent misdirected loyalties. The record shows that after Ragnar's October 16, 2015 request for Final Completion, JBBR and Ragnar exchanged letters on a regular basis regarding that issue.[147] For JBBR, Mr. Schnitzer authored each letter for Bradley Oswald to send.[148] Mr. Sheehan communicated with Mr. Schnitzer about Final Completion issues.[149]

---

[141] JX302; July 6 Tr. at 24:9-25:22.
[142] JX1180.
[143] July 6 Tr. at 25:23-28:1.
[144] JX1089.
[145] July 6 Tr. at 32:18–39:3.
[146] JX1185 ("condensate system not fully operational"); July 6 Tr. at 55:16–58:10.
[147] *See, e.g.,* JX4, JX12, JX13, JX109, JX1158, JX1159, JX1160a, JX1162, JX1163, JX1164, and JX1165
[148] July 7 Tr. at 24:19-25:1; 32:16–33:2; 34:8-13; and 37:11-15.
[149] July 7 Tr. at 16:2-19:3; 21:10–22:16; 23:2-8; and 36:8-14; *see also* JX9, JX10, JX1153, JX1155, JX1156, JX1157, and JX1166.

Yet it appears that Mr. Sheehan also engaged with representatives of Ragnar to help Ragnar respond to JBBR's letters. For example, on October 19, 2015, Mr. Schnitzer emailed Mr. Sheehan suggesting specific language acceptable to JBBR for a Final Completion certificate.[150] Mr. Sheehan, without including anyone from JBBR, emailed representatives of Ragnar and Wilson.[151] Mr. Sheehan addressed the Ragnar/Wilson group as "Team" and said, "here is the language I propose."[152] Thereafter, Mr. Sheehan stated: "This is all related to the construction contract between JBBR and Ragnar. As you know, Zenith now owns JBBR, so the language can say whatever you guys want it to say. I'm just the messenger."[153] The email makes sense only in the context of Mr. Sheehan's having advised Ragnar and Wilson of Mr. Schnitzer's language and providing appropriate responses to that language.

On December 4, 2015, JBBR sent a letter to Ragnar.[154] On December 5, 2015, Mr. Sheehan assisted Ragnar on its negotiating posture, suggesting arguments to make and payouts to request.[155] Mr. Schnitzer testified that he did not know that Mr. Sheehan was communicating with Ragnar and Wilson.[156]

On December 11, 2015, Mr. Hernandez, a Ragnar employee, drafted a response to a JBBR letter.[157] Mr. Hernandez sent the draft to Tim Jagielski, an attorney for Ragnar, and Mr. Sheehan for comment.[158] Mr. Sheehan responded with suggestions.[159] Mr. Jagielski responded with another draft.[160] Mr. Sheehan then forwarded Mr. Jagielski's email to CenterPoint's

---

[150] JX1411.
[151] *Id.*
[152] *Id.*
[153] *Id.*
[154] JX1159.
[155] JX1123; JX1128.
[156] July 7 Tr. at 30:3–31:21.
[157] JX1128.
[158] *Id.*
[159] *Id.*
[160] *Id.*

outside counsel at Vinson & Elkins.[161]  Outside counsel commented and supposedly redlined the letter.[162]  Mr. Sheehan forwarded edits to Ragnar and requested times "later this week" for a conference call with Vinson & Elkins.[163]  The draft letter was further edited with additional input from Mr. Sheehan.[164]  Ragnar then sent a responsive letter to JBBR on December 16, 2015[165] This responsive letter included some of Mr. Sheehan's suggested changes, including proposing "the 'outside date' of 1/31/16" for testing.[166]

The evidentiary record at Trial does not demonstrate that Mr. Sheehan ever made JBBR aware of his work with Ragnar and Wilson regarding the correspondence related to Final Completion.

Mr. Sheehan was given information on whether the Terminal was operational.  Kenneth Hancock, Wilson's Senior VP, wrote on February 25, 2016, "As you know, the steam condensate system is not currently operational and has not yet been commissioned."[167]  In a March 2, 2016, email to Mr. Sheehan, among others, Mr. Hancock said "please note that with the condensate system not fully operational at this time…"[168]  Mr. Sheehan apparently never relayed that information on to JBBR.

---

[161] JX1127.
[162] *Id*.
[163] *Id*.
[164] JX1128.
[165] JX1160a.
[166] *Compare* JX1128 *with* JX1160a.
[167] JX1421.
[168] JX1185.

### 3. *Remediation by Ambitech.*

JBBR retained Ambitech in early 2017 to deal with unresolved issues at the Terminal.[169] Ambitech inspected the Terminal and prepared a report of its findings[170] In addition, Ambitech made recommendations to JBBR for Phase 1 and Phase 2 remediation work.[171]

Ambitech performed the Phase 1 remediation work in 2017 so that JBBR could fulfill its obligations under the TSA for the 2017—2018 heating season.[172] JBBR spent $3,091,157.64 on the Phase 1 remediation work.[173] Mr. Haduch testified that the Phase 1 remediation work caused an improvement in the operability of the Terminal.[174] JBBR was able to service 10-15 trains per month during the 2017-2018 heating season[175]

JBBR made a demand for indemnification under Purchase Agreement Section 10.1.[176] CenterPoint rejected that demand.[177]

### F. RELATED LITIGATION

On January 23, 2017, Ragnar filed a lawsuit against JBBR in Will County, Illinois seeking $992,990.40 (the "Illinois Action").[178] Ragnar seeks payment due upon Final Completion under the Construction Contract.[179] JBBR filed a counterclaim against Ragnar for breach of the Construction Contract.[180] On July 23, 2017, JBBR filed a third-party complaint against Wilson for breach of the MSA.[181]

---

[169] July 5 Tr. at 38:3-10.
[170] JX16.
[171] *Id*.
[172] *Id*.; July 6 Tr. at 89:6-91:3.
[173] July 6 Tr. at 93:5-97:23; JX15; JX1294; JX1480.
[174] July 6 Tr. at 91:4-97:23.
[175] July 6 Tr. at 91:4-92:7.
[176] JX1426; JX1428; and JX1481.
[177] JX1427; JX1429.
[178] Am. Compl. ¶ 49; Def.'s Mot. for Summ. J. at 23.
[179] Def.'s Mot. for Summ. J. at 23.
[180] Am. Compl. ¶ 49 (noting the filing occurred on April 26, 2017); Def.'s Mot. for Summ. J. at 23 (noting the filing occurred on March 23, 2017).
[181] Am. Compl. ¶ 49; Def.'s Mot. for Summ. J. at 23.

CenterPoint is not a party to the Illinois Action.[182]

The Illinois Action is scheduled for trial on September 23, 2024.[183]

## V.     APPLICABLE LAW

The Court will be applying the following general legal principles:

### A.  GOVERNING SUBSTANTIVE LAW

Delaware law applies here.  First, the Purchase Agreement is governed by Delaware law. Purchase Agreement Section 12.10(a) states that "[t]his Agreement shall be governed by and construed, interpreted and enforced in accordance with the Laws of the State of Delaware…."[184] Construction Management Agreement Section 11(h) contains identical language.[185]

### B.  BREACH OF CONTRACT

Under Delaware law, to prove a breach of contract claim, a party must show: "(1) a contractual obligation; (2) a breach of that obligation; and (3) resulting damages."[186]  A party harmed by a breach of contract is entitled to compensation that will place that party in the same position that the party would have been in if the other party had performed under the contract.[187]

The standard remedy for breach of contract is based upon the reasonable expectations of the contracting parties.[188]  Expectation damages are measured by determining "the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[189]  "Damages for a breach of contract must be proven with reasonable certainty.

---

[182] JX6 § 11(h); JX20 § 12.10(a).
[183] D.I. No. 205.
[184] JX20 § 12.10(a).
[185] JX6 § 11(h).
[186] *Interim Healthcare, Inc. v. Spherion Corp.*, 884 A.2d 513, 548 (Del. Super. 2005).
[187] *See E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 445-46 (Del. 1996).
[188] *See Duncan v. Theratx, Inc.*, 775 A.2d 1019, 1022 (Del. 2001).
[189] *Id.*

Recovery is not available to the extent that the alleged damages are uncertain, contingent, conjectural, or speculative."[190]

"Delaware adheres to the 'objective' theory of contracts, *i.e.*[,] a contract's construction should be that which would be understood by an objective, reasonable third party."[191] "Contract terms themselves will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language."[192] The Court has already held that the Purchase Agreement and the Construction Management Agreement are unambiguous.[193]

### C. PRINCIPAL-AGENT

Generally, agency is a fiduciary relationship that arises when a principal manifests assent to another that the agent will act on the principal's behalf and subject to the principal's control and the agent manifests assent or otherwise consents to act as agent.[194] The existence of an agency relationship empowers an agent to act on behalf of the principal.[195] When accompanied by trust that the agent will use the principal's confidential information to pursue the principal's ends, that relationship also imposes fiduciary duties on the principal.[196]

Agents owe their principals a duty to disclose certain information.[197] Agents also owe a duty to avoid gaining an interest adverse to the principal.[198] Under elemental principles of agency law:

---

[190] *Lee-Scott v. Shute*, 2017 WL 1201158, at *7 (Del. Com. Pl. Jan. 30, 2017).
[191] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010) (citing *NBC Universal v. Paxson Commc'ns*, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29, 2005)).
[192] *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997).
[193] *Zenith Energy Terminals Joliet Holdings LLC*, 2023 WL 615997, at *9-11.
[194] *Estate of Eller v. Barton*, 31 A.3d 895, 897 (Del. 2011).
[195] *Id*. at 898.
[196] *Id*. (citing to *Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928).
[197] *Id*.
[198] *Id*.

[A]n agent owes his principal a duty of good faith, loyalty and fair dealing. Encompassed with such general duties of an agent is a duty to disclose information that is relevant to the affairs of the agency entrusted to him. There is also a corollary duty of an agent not to put himself in a position antagonistic to his principal concerning the subject matter of his agency.[199]

## D. BURDEN OF PROOF BY A PREPONDERANCE OF THE EVIDENCE

In a civil case, the burden of proof is by a preponderance of the evidence. Proof by a preponderance of the evidence means proof that something is more likely than not. This means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes the Court believe that something is more likely true than not. If the evidence on any particular point is evenly balanced, the party having the burden of proof has not proved that point by a preponderance of the evidence, and the Court must find against the party on that point.[200]

In deciding whether any fact has been proved by a preponderance of the evidence, the Court may consider the testimony of all witnesses regardless of who called them, and all exhibits received into evidence regardless of who produced them.

In this particular case, Zenith carries the burden of proof by a preponderance of the evidence on its claims under the Purchase Agreement and the Construction Management Agreement.[201]

## E. EVIDENCE EQUALLY BALANCED

If the evidence tends equally to suggest two inconsistent views, neither has been established. That is, where the evidence shows that one or two things may have caused the breach/damages: one for which a party was responsible and one for which a party was not, the

---

[199] *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 962 (Del. 1980)
[200] Superior Court Civil Pattern Jury Instruction 4.1.
[201] *See, e.g.*, *Reynolds v. Reynolds*, 237 A.2d 708, 711 (Del. 1967) (defining preponderance of the evidence); *Oberly v. Howard Hughes Medical Inst.*, 472 A.2d 366, 390 (Del. Ch, 1984) (same).

Court cannot find for the party carrying the burden of proof if it is just as likely that the breach/damages was caused by one thing as by the other.[202]

## VI. DISCUSSION

### A. THE COURT FINDS THAT ZENITH HAS SHOWN, BY A PREPONDERANCE OF THE EVIDENCE, THAT CENTERPOINT BREACHED THE PURCHASE AGREEMENT.

In Count I, Zenith contends that CenterPoint breached the Purchase Agreement because CenterPoint failed use reasonable best efforts to cause Final Completion. Per the Amended Complaint and the theories advanced at Trial, Purchase Agreement Section 6.15(a) is especially relevant. Section 6.15(a) is labeled "Final Completion," and it states:

> After Closing, on and subject to the terms of the Construction Contract [with Ragnar] and the Construction Management Agreement, [CenterPoint] shall use its reasonable best efforts to achieve, and to cause the EPC Contractor [Ragnar] (and any other applicable third party contractors or service providers) to achieve, Final Completion in accordance with the Approved Cost Plan and the Project Schedule and otherwise in accordance with the terms and conditions of the Construction Contract and the Construction Management Agreement in all material respects.[203]

The Court previously found that Section 6.15(a) is subject to only one reasonable interpretation—CenterPoint was required to use its "reasonable best efforts" to achieve, and cause any contractor to achieve, Final Completion.

In the Purchase Agreement, "Final Completion" is defined as "the meaning given in the Construction Contract."[204] The Construction Contract between JBBR and Ragnar, dated August 26, 2014, defines "Final Completion" as:

> [T]hat point in time in the progress of the Work after Mechanical Completion when (a) the Work has been completed and is operational; (b) all testing (including hydrotesting) and coating is complete; (c) all pipe, valves, and Equipment installation and tie-ins are complete; (d) all essential Equipment and lines have been hydrotested and had a geometry tool run through them; (e) the Work is capable of transporting refined products in a safe uninterrupted manner 24 hours per day,

---

[202] Superior Court Civil Pattern Jury Instruction 4.2.
[203] Pls.' Mot. for Summ. J., Ex. N (Purchase Agreement) § 6.15(a).
[204] *Id.* at Annex I.

27

seven days per week without further anticipated shutdowns, except for preventative maintenance; (f) and all other requirements of this [Construction Contract] with respect to Final Completion ([including those set forth in Construction Contract Exhibit A]) have been satisfied.[205]

Exhibit A of the Construction Contract sets out the "Minimum Requirements for Final Completion" and defines them as:

(a) Final Completion includes, at a minimum, the following: (i) any liquidated damages payable by [Ragnar] to [JBBR] pursuant to th[is Construction Contract] have been paid and/or satisfied; (ii) [Ragnar] has completed all the Work required by this [Construction Contract]; (iii) [Ragnar] has executed and delivered to [JBBR] and [JBBR] has accepted the lien waiver . . .; (iv) [Ragnar] has provided the final close-out report to [JBBR]; (v) there are no outstanding claims or disputes as between [Ragnar and JBBR];….[206]

Exhibit A additionally required that "any liquidated damages payable by Contractor to Company pursuant to the Agreement have been paid and/or satisfied" and that "there are no outstanding claims or disputes between the Parties."[207]

Two factual issues had to be decided at Trial. First, the Court had to determine whether Final Completion had been achieved. Second, the Court needed to determine whether CenterPoint used "reasonable best efforts" to achieve, and to cause Ragnar to achieve, Final Completion in accordance with the Approved Cost Plan and the Project Schedule. The Court finds that Final Completion was not achieved during the relevant time period. The Court also finds that CenterPoint did not use reasonable best efforts.

Initially, the record demonstrates that Ragnar has not paid any liquidated damages to JBBR or Zenith. The Court does not find that surprising as that issue is contested in the pending

---

[205] Am. Compl., JX1 § 1.1; *see also id.* ("'Work' shall mean all of [Ragnar's] obligations, duties and responsibilities under this [Construction Contract], including the design, engineering, procurement, manufacturing, supply, installation, erection, construction, commissioning, and testing of the Facilities, all work and services described in <u>Exhibit A</u> and all Warranty Work.") (underlining in original).
[206] *Id.* at Ex. A.
[207] *Id.*

Illinois Action. Moreover, the Illinois Action demonstrates that there are still "outstanding claims or disputes between" Ragnar and JBBR and Zenith.

The Court finds that the defined term "Work" is relevant to the ultimate finding that Final Completion did not happen. The record shows that Mechanical Completion had happened. However, the record also shows that Ragnar did not complete all the Work required by the Construction Contract. The Construction Contract defines "Work" to

> [M]ean all of [Ragnar's] obligations, duties and responsibilities under this [Construction Contract], including the design, engineering, procurement, manufacturing, supply, installation, erection, construction, **commissioning, and testing of the Facilities**, all work and services described in <u>Exhibit A</u> and all Warranty Work."[208]

The evidence demonstrates that the Terminal had not been properly commissioned or tested.[209] On October 9, 2015, Ragnar admitted this when asking for an extension of the "Date for Final Completion from by July 1, 2015 to October 16, 2015.[210] Wilson, on October 27, 2015, stated that "steam needs to be commissioned under load."[211] The steam condensate system and commissioning issues continued into 2016. On February 10, 2016, Mr. Haduch noted that uploading rates were poor because of difficulties getting crude oil uploaded from the railcars.[212]

In addition, the factual record does not support a finding that the "Work" done by Ragnar was "capable of transporting refined products in a safe uninterrupted manner 24 hours per day, seven days per week without further anticipated shutdowns, except for preventative maintenance."[213] During all times relevant, the Terminal was unable to meet this standard. CenterPoint knew this to be true. Mr. Sheehan, in an e-mail, stated:

---

[208] Id. § 1.1 (underlining in original) (emphasis added).
[209] CenterPoint contends that Final Completion does not include commissioning. The defined term "Work" is used in the Construction Agreement and includes commissioning.
[210] JX1408.
[211] JX1180.
[212] JX1421.
[213] Am. Compl., JX1 § 1.1.

29

Thank you for the update on the upcoming train schedule, and thank you in advance for passing along any additional updates that you may receive. CenterPoint will continue to use reasonable best efforts to cause Ragnar Benson to achieve Final Completion as agreed upon by all the parties, notwithstanding the ongoing disagreement between [Zenith] and Ragnar with respect to the inbound pumping system and the occurrence of Final Completion. It is my understanding that Ragnar will to cause certain subcontractors and subconsultants to be present for the train scheduled to arrive on 2/19/16. That sounds like good news from my perspective.[214]

Wilson, Zenith and others continued to work on the steam issues and tried to arrive at solutions. There was a train steaming failure on March 8, 2016.[215] On March 28, 2016, Mr. Didier identified continuing problems with steam levels while unloading railcars.[216] E-mail correspondence among Wilson, Ragnar, CenterPoint and Zenith indicates that, as of March 30, 2016, Wilson was addressing design issues and coming up with new recommendations.[217]

Under Delaware law, "reasonable best efforts" means a party is "obligat[ed] to take all reasonable steps to solve problems and consummate the transaction."[218] However, "it cannot mean everything possible under the sun."[219] In the context of merger agreements, the Court of Chancery has "looked to whether the party subject to the clause (i) had reasonable grounds to take the action it did and (ii) sought to address problems with its counterparty" in determining whether the "reasonable best efforts" standard was met.[220] "Determining whether a party used reasonable best efforts is an inherently factual inquiry."[221]

---

[214] JX1417.

[215] July Tr. at 69:2-4; JX1187.

[216] JX1418.

[217] *Id.*

[218] *Williams Cos., Inc. v. Energy Transfer Equity, L.P.*, 159 A.3d 264, 272 (Del. 2017) (citing *Hexion Specialty Chems., Inc. v. Huntsman Corp*, 965 A.2d 715, 755-56 (Del. Ch. 2008)).

[219] *AB Stable VIII LLC v. Maps Hotels & Resorts One LLC*, 2020 WL 7024929, at *91 (Del. Ch. Nov. 30, 2020) (citing *Alliance Data Sys. Corp. v. Blackstone Cap. P'rs V L.P.*, 963 A.2d 746, 763 n.60 (Del. Ch. 2009)).

[220] *Menn v. ConMed Corp.*, 2022 WL 2387802, at *35 (Del. Ch. June 30, 2022) (citing *Akron, Inc. v. Fresenius Kabi AG*, 2018 WL 4719347, at *91 (Del. Ch. Oct. 1, 2018)).

[221] *In re WeWork Litig.*, 2020 WL 6375438, at *9 (Del. Ch. Oct. 30, 2020). The Chancery Court stated this rule in the context of a motion to dismiss, noting that whether a party used reasonable best efforts is an inquiry "not readily amenable to resolution at the pleadings stage." *Id.* Nonetheless, the inquiry is still "inherently factual." *See id.*

As discussed in the Findings of Fact, CenterPoint did not use "reasonable best efforts" to cause Final Completion. CenterPoint is JBBR's agent. As such, CenterPoint owed duties to JBBR. CenterPoint violated theses duties. Mr. Sheehan, who did not testify, seemed to be working with Ragnar and Wilson and against the interests of JBBR and Zenith. This conduct demonstrates a breach of an agent's duty of loyalty. Mr. Sheehan knew of issues in 2015 and 2016 and did not convey his knowledge to JBBR or Zenith. One of the many examples of this is that Wilson advised Mr. Sheehan and others that the steam condensate system was not operational or commissioned on February 25, 2016.[222] Wilson again noted issues with the system on March 2, 2016.[223] The record does not show that Mr. Sheehan properly informed JBBR of this. This conduct demonstrates a breach of an agent's duty to disclose information that is relevant to the affairs of the agency entrusted to CenterPoint.

The record is virtually devoid of actions taken by CenterPoint, on behalf of JBBR or Zenith, in a manner that would have caused Ragnar to achieve Final Completion. CenterPoint may have been able to rebut these points through Mr. Sheehan or others but failed to do so at the Trial.

Eventually, Zenith went outside of CenterPoint and Ragnar and retained Ambitech to address issues at the terminal.[224]

### B. THE COURT FINDS THAT ZENITH HAS SHOWN, BY A PREPONDERANCE OF THE EVIDENCE, THAT CENTERPOINT BREACHED THE CONSTRUCTION MANAGEMENT AGREEMENT.

Construction Management Agreement Section 2(b), titled "Construction Management Services," states:

> [CenterPoint] shall perform the Services with substantially the same standard of care (including quality) as the Services were performed by or on behalf of [JBBR]

---

[222] JX1421.
[223] JX1185.
[224] July Tr. at 38:3-10.

prior to the Effective Date, including, without limitation, by performing the Services, at all times, as would a reasonably prudent construction manager in the construction management industry.[225]

Construction Management Agreement Section 2(h) limits Section 2, and it provides that "except as expressly set forth in Section 2, no representations, warranties or guaranties of any kind, express or implied . . . are made by [CenterPoint] with respect to the services provided under [the Construction Management Agreement]," and that all representations and warranties are waived and disclaimed to the fullest extent of the law.[226]

On Count II, the Court notes that the issue for each party is whether CenterPoint performed its services "as would a reasonably prudent construction manager in the construction management industry."[227] The issue regarding the Construction Management Agreement is the "reasonably prudent construction manager" language in Section 2(b). The "reasonably prudent person" standard "is an objective standard" and a "fact-intensive inquiry."[228]

The Court's findings regarding CenterPoint's conduct relating to Final Completion and breach of its duties as agent are enough to demonstrate a breach here. In addition, the Court heard from Mr. Vinson[229] and Mr. Hanan[230] on what a reasonably prudent construction manager in the construction management industry must do when providing construction management services. The Court does find each opinion credible; however, Mr. Hanan's opinion that CenterPoint did not perform its duties as a reasonable prudent construction manager is stronger given the actual facts of this case. Mr. Vinson testified generally on what a reasonably prudent

[225] Pls.' Mot. for Summ. J., Ex. O § 2(b).
[226] *Id.*, Ex. O § 2(h).
[227] *See id.*, Ex. O § 2(b).
[228] *CMS Inv. Hldgs., LLC v. Castle*, 2015 WL 3894021, at *11 (Del. Ch. June 23, 2015).
[229] Aug. 21 Tr. 119:23-120:13; Aug. 21 Tr. 121:2-131:6.
[230] July 5 Tr. at 162:20-163:4; July 5 Tr. at 167:1-8; July 5 Tr. at 168:21-170:12.

construction manager would do; however, Mr. Vinson did not have an opinion as to CenterPoint's role under the applicable agreements.[231]

## C. DAMAGES

The Court finds that Zenith has demonstrated damages proximately caused by CenterPoint's breach of the Purchase Agreement and the Construction Management Agreement. Zenith had to engage in remediation work to complete the Terminal. Zenith proved by a preponderance of the evidence that it suffered $3,091,157.64 in Phase I remediation work.[232] In addition, Zenith has been engaged in the Illinois Action and has a right to be indemnified for losses in connection with that litigation under Construction Management Agreement Section 8(d) and Purchase Agreement Section 10.1(b). At this point, the indemnification damages cannot be quantified.

The Court does not find that Zenith is entitled to "Liquidated Damages." Zenith presented this damage theory only at the end of the litigation. Zenith has not asked the Court to amend its Amended Complaint to add this damage claim. Instead, Zenith began raising the issue in its pretrial brief and in post-Trial briefing. The Court denied a motion to strike Zenith's claim for Liquidated Damages but that was so the Court could review the entire record for support for this damage claim.

The Court will allow Zenith to offset any earn out payments due to CenterPoint under Purchase Agreement Section 10.8. However, the Court will not hold that such obligations are "terminated" due to CenterPoint's breaches of the Purchase Agreement and the Construction

---

[231] Aug. 21 Tr. at 183:9-20.
[232] *See, e.g.*, JX15; JX1294; JX1480.

Management Agreement.  Zenith has not asked for such relief.  In fact, the Amended Complaint only asks for a "setoff" of earn out payments and not a termination.[233]

The Court also finds that Zenith's requests for Liquidated Damages and termination of the earn out payments are over-reaching under the circumstances.  As set out above,  Exxon owned and operated an oil refinery near the Terminal.[234]  JBBR and Exxon entered into the TSA.[235]  The TSA was a "take or pay" contract, meaning Exxon was required to make regular minimum payments even if Exxon did not need a specified number of trains unloaded for the requisite period.[236]  TSA Section 7.5 provides: "[Exxon] shall be obligated to pay the Monthly Committed Payment…regardless of whether [Exxon] in fact delivers all or any of the Committed Volume…."[237]  One of the interesting facts of this case is that Exxon performed fully under the TSA.  As such, even with all of the problems relating to Final Completion and remediation, JBBR received the full benefit of the TSA.  Zenith did not demonstrate that any damages were suffered by third parties like Exxon.

---

[233] Am. Compl. at 21 (subsection D in prayer for relief).
[234] *Id*.
[235] JX25.
[236] *Id*. §7 ("Volume and Fees") and §7.5.
[237] *Id*. § 7.5.

## VII.    CONCLUSION

The Court holds that Zenith has properly proved that CenterPoint breached the Purchase Agreement and the Construction Management Agreement.  Judgment shall be entered in favor of Zenith on Count I and Count II of the Amended Complaint.  Damages are initially set at $3,091,157.64 with the right of Zenith to submit additional evidence on its indemnification claims.

**IT IS SO ORDERED**

Dated: July 29, 2024
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:  File&ServeXpress