COURT OF APPEALS OF VIRGINIA

Present: Judges Beales, Athey and Callins
Argued at Arlington, Virginia

DAVID KIRDASSI, ET AL.

v.        Record No. 0164-24-4

MITCHELL SCOTT WHITE, DC, ET AL.

OPINION BY
JUDGE DOMINIQUE A. CALLINS
MARCH 25, 2025

FROM THE CIRCUIT COURT OF FAIRFAX COUNTY
Penney S. Azcarate, Judge[1]

David G. Tripp (The Law Offices of David G. Tripp, on briefs), for
appellants.

William H. McCarty, Jr. (Purnell, McKennett & Menke, PC, on
brief), for appellees.

This matter comes before the Court following judgment on a complaint brought by David

Kirdassi and Laser Spine & Joint Center ("LSJC") against Mitchell Scott White ("Scott"), his

son, Joshua, Woodbridge Chiropractic Clinic, and Laser Spine & Pain Center (collectively

"Defendants"). Kirdassi and LSJC argue on appeal that the trial court erred by (1) failing to find

that Joshua breached his fiduciary duties, (2) failing to assess damages against Scott and Joshua

for breach of fiduciary duty, (3) awarding less damages on breach of contract than those that

were proven at trial, (4) misapplying Virginia law on the conversion claim, and (5) misapplying

Virginia law on the conspiracy claims. Meanwhile, Defendants argue that the trial court erred by

(1) awarding compensatory damages on Kirdassi's breach of contract claim for want of

proximate cause, (2) failing to find that Kirdassi breached his fiduciary duties, (3) failing to find

---

[1] Judge Azcarate entered the final order in this matter, but retired Judge Dennis J. Smith
presided, while sitting designate, over the bench trial.

that Kirdassi did not mitigate his damages, and (4) failing to find that Scott is entitled to offset his damages based on contributions he made to the business venture at issue in the underlying case.

We hold, among other things, that the trial court erred in (1) failing to find that Joshua breached his fiduciary duty of loyalty to LSJC, (2) failing to award damages on LSJC's breach of fiduciary duty claim, (3) misconstruing the Shareholders' Agreement resulting in an erroneous calculation of damages on the breach of contract claim, and (4) misinterpreting Virginia law on the conversion claim. We affirm in part, reverse in part, and remand these proceedings for the reasons that follow.

## BACKGROUND[2]

### I. Formation of LSJC

For over 35 years, Scott owned Woodbridge Chiropractic Clinic, P.C. ("Woodbridge"), which operated chiropractic clinics in two locations: Woodbridge and McLean. As part of his practice, Scott offered low-level laser therapy to patients. In 2015 and 2016, Kirdassi, a successful businessman and investor, received laser treatments at the McLean clinic and found that the treatments improved his back pain. After discussing the idea of opening laser clinics together, Kirdassi and Scott began their joint business venture "with a handshake."

In March 2016, Kirdassi and Scott formed LSJC, incorporated under the laws of Delaware. Kirdassi served as the CEO and Chairman of the Board, and Scott served as COO and President, managing the day-to-day operations of the business. Scott drafted and sent a "Business Plan Data Sheet" to Kirdassi, stating that LSJC's strategic business plan for the next "year or two" would be "[t]o open laser clinics (approximately every 3 months)."

---

[2] "We view the evidence in the light most favorable to . . . the prevailing part[ies] at trial." *Johnson v. DeBusk Farm, Inc.*, 272 Va. 726, 728 (2006).

To fund their joint venture, Kirdassi and Scott negotiated a "Term Sheet," which provided that Kirdassi would pay

> $100,000 to M. Scott White ("Co-Owner") for 50% of the equipment, assets, goodwill, business plans, and intellectual property presently owned by the New Life Laser of NOVA (the McLean division) of Woodbridge Chiropractic Clinic, P.C. ("Present Business"). [Kirdassi] will contribute these assets plus $25,000 in cash to the Company for a 50% equity interest in the Company.

Consistent with the provisions of the Term Sheet, on May 25, 2016, the parties signed an "Asset Purchase Agreement" ("APA"), pursuant to which Kirdassi paid $100,000 to Scott for 50% of Woodbridge's assets. The parties likewise signed a "Stock Purchase Agreement" ("SPA"), pursuant to which Kirdassi and Scott each paid $25,000 to LSJC in exchange for 5,000 shares of LSJC stock.

In addition to the APA and SPA, the parties signed a "Shareholders' Agreement." Pertinent to this appeal, the Shareholders' Agreement required the officers to "keep or cause to be kept complete and accurate books and records of the Corporation and supporting documentation." It provided that "true and full information" must be kept and "[e]ach shareholder shall have access thereto at all reasonable times."

The Shareholders' Agreement also required that LSJC "appoint an independent certified public accountant." LSJC's officers were further required to obtain the unanimous consent of the Board of Directors to: (1) enter into any "corporate financial obligation," (2) incur any debt, whether secured or unsecured, direct or contingent, in the ordinary course of business, (3) "[merge] or consolidate[e] the Company with another Person," or (4) "[sell] . . . substantially all of the Company's assets." Finally, the Shareholders' Agreement provided that Scott "will not engage in any activities which will be in conflict in any way with the business interests of the Company."

Three of the foregoing documents contained choice of law provisions. By their terms, the APA and SPA each recited that they are to be "construed and governed by the substantive law of the Commonwealth of Virginia." Meanwhile, the Shareholders' Agreement provided that it is "subject to and governed by the laws of the District of Columbia." Neither the Term Sheet nor the Business Plan designated the laws of any specific jurisdiction as controlling on those documents.

II. Rise and Fall of LSJC

By October 2016, LSJC was operating five separate clinics: four Virginia offices in McLean, Lansdowne, Arlington, and Fairfax, and one Maryland office in Bethesda. The McLean and Lansdowne clinics opened in May 2016; the McLean clinic closed in February 2017, and the Lansdowne clinic closed in April 2017. The Bethesda clinic opened in June 2016 and closed in March 2018. The Arlington clinic opened in October 2016 and closed in April 2018. The Fairfax clinic opened in September 2016 and was the last remaining LSJC clinic prior to its closing in July 2018.

To receive "better rates" for LSJC, Scott personally guaranteed the clinic and equipment leases. Additionally, and soon after LSJC's formation, Scott hired his chiropractor son, Joshua, to work at LSJC. Meanwhile, Kirdassi searched for clinic offices in Florida with his son. Although they searched, LSJC never opened a clinic in Florida.

Sometime after the initial investment in 2016, Scott told Kirdassi that he was making additional financial contributions to LSJC, and he requested that Kirdassi match his contributions. From June to December 2016, Kirdassi made an additional $143,827.82 in contributions to LSJC upon Scott's request.

As Kirdassi made contributions, however, he grew increasingly concerned about the status of LSJC. Kirdassi did not receive LSJC's income statements, cash flow statements,

balance sheets, or financial statements as he requested. He testified that he never received any financial statements from a CPA. Although Jesse White—Scott's son—sent various emails and financial reports to Kirdassi about LSJC, Kirdassi still felt "in the blind," and sought additional financial information he believed essential to a thorough evaluation of LSJC.

Joshua played a prominent role in LSJC's business from its inception. According to Scott, he "wanted nothing to do" with a business venture with Kirdassi, but Joshua "petition[ed] [Scott] and eventually over time, [Scott] gave in." Joshua began working in one of LSJC's clinics. He, like Jesse, sent Kirdassi "weekly sales reports" at the request of Kirdassi. He regularly conferred with Scott in Scott's capacity as COO. At the same time, Kirdassi confided in Joshua, and consulted with him to ascertain whether Joshua "had any ideas that could increase [LSJC's] profitability." Indeed, Joshua appears to have even served as a primary point of contact for certain official communications.

Additionally, Kirdassi was concerned about the lack of proper bookkeeping and accounting. Scott hired his wife, Janelle, as LSJC's bookkeeper. After Janelle became overwhelmed by managing the books for Woodbridge and LSJC, Scott hired Jesse to act as LSJC's bookkeeper. Kirdassi testified that he requested that Scott hire a professional bookkeeper "from day one," but Scott denied this request, stating that LSJC could hire a professional bookkeeper if Kirdassi paid for it personally. According to Scott's testimony, he did not require that Kirdassi personally pay for a professional bookkeeper "early on" and that, in fact, Scott "suggested that [they] get another bookkeeper so that [Kirdassi] could have the records the way he needed them." But as the business relationship continued, money "was a

huge issue," so Scott did not believe LSJC had the money to afford a professional bookkeeper or accountant.[3]

The relationship between Kirdassi and Scott deteriorated, and, according to Kirdassi's testimony, Scott would only meet with him when Scott wanted money. Kirdassi continued to request more robust financial statements, including requesting these documents from Jesse directly. According to Scott's testimony, Kirdassi significantly pulled away from the affairs of LSJC and "was AWOL."

On February 27, 2017, Scott and Jesse told Kirdassi that LSJC's clinics "ha[d] become profitable." In March 2017, Kirdassi contributed an additional $20,000 to LSJC. The total amount Kirdassi contributed, including his initial $125,000 investment, summed to $288,827.82. In July 2017, Kirdassi texted Scott that he would no longer make any investments in LSJC, citing a lack of accountability and oversight. Meanwhile, Scott and Woodbridge poured significant additional funds into LSJC. By June 2018, four of the five clinics had closed, and patients from the closed clinics were transferred to the last remaining clinic in Fairfax.

III. Transfer of LSJC to Joshua and the Formation of Laser Spine and Pain Center

On June 7, 2018, a sheriff appeared at the Fairfax clinic and told Joshua that LSJC would be evicted the following week for nonpayment of rent totaling $6,534.54. Joshua then called Scott, and the two agreed that Scott would transfer LSJC's last remaining clinic to Joshua and that Joshua would assume the leases, pay the back rent, and take responsibility for the office. Although Scott attempted to call Kirdassi, Kirdassi did not answer.

On June 8, 2018, Joshua gave a cashier's check to the Fairfax clinic landlord. Scott thereafter provided to Joshua the LSJC patient records. After using LSJC's bank accounts for a

---

[3] The parties use "bookkeeper" and "accountant" interchangeably. At trial, Scott clarified that Janelle was a *bookkeeper*, not an accountant, and that Jesse operated as a bookkeeper.

few months, Joshua created a new company named "Laser Spine and Pain Center." Joshua's new company continued to operate from what had been LSJC's Fairfax clinic.

IV. This Litigation

Kirdassi and LSJC filed a complaint in the trial court against Scott, Joshua, Woodbridge, and Laser Spine and Pain Center, asserting breach of fiduciary duty (Count I), breach of contract (Count II), common law conspiracy (Count III), statutory conspiracy (Count IV), and conversion (Count V). All five counts were brought both directly on behalf of Kirdassi and derivatively on behalf of LSJC, with the exception of the conversion count, which was brought solely as a derivative claim on behalf of LSJC.[4] The complaint, as amended, alleged that Scott willfully mismanaged LSJC, breached its Shareholders' Agreement, and conspired to transfer its assets to his son, Joshua, who created Laser Spine and Pain Center.

At a three-day bench trial, the trial court heard testimony from Walter Carter Pennington, a CPA and expert in business valuation. Pennington testified that his valuation estimate of LSJC was $545,307.00. But he also admitted: "do I believe that I've got all the revenue; no. Do I believe I've got at least a reasonable amount of revenue; yes." Scott W. Smith, a "self-employed tax preparer," also testified. He testified that LSJC's QuickBooks reports were inaccurate; costs "like the credit cards, the advertising" and others were not recorded in the corporation's QuickBooks files. Additionally, Smith testified that LSJC was using money from Woodbridge to pay LSJC's bills, "but no loan documentation was created so it really wouldn't be considered loans without loan documentation."

Following the presentation of evidence, the trial court ruled from the bench that Kirdassi did not establish by clear and convincing evidence that a conspiracy occurred. Therefore,

---

[4] The individual claim of breach of fiduciary duty by Kirdassi was dismissed on demurrer.

Kirdassi's common law and statutory conspiracy claims failed. The trial court likewise found that Kirdassi's claim of conversion failed because the evidence was insufficient to establish "a conscious disregard or reckless indifference to the rights of Mr. Kirdassi."

The trial court, however, found that Scott breached his fiduciary duties because "he was the COO and he had an obligation to look to the finances of the corporation which he did not do." Additionally, the trial court noted that Scott failed to hire an accountant and "was not really involved in knowing what was going on with [LSJC's] numbers." The trial court opined on the intertwining of funds between Woodbridge and LSJC, noting the impossibility of determining where funds and expenses went between the two.

Finally, the trial court found that "there was a clear breach of the corporate documents in the sale and transfer" of the Fairfax clinic. The court noted that while the transfer of the clinic to Joshua benefitted LSJC, it also conferred "some personal benefit" on Scott as well because his personal guarantees "were wiped out" and he could avoid declaring bankruptcy. In sum, the trial court found that LSJC succeeded on its derivative claim for breach of fiduciary duty against Scott but failed to prove damages, and Kirdassi succeeded on his direct claim for breach of contract against Scott; it further found that both conspiracy claims and the conversion claim failed.

In assessing damages, the trial court noted the difficulty in determining an amount by which Kirdassi and LSJC were aggrieved for the breach of contract and breach of fiduciary duties, respectively. Regarding the initial $100,000 that Kirdassi paid for the McLean clinic pursuant to the APA, the trial court stated that because "everything was leased" in the McLean clinic, Kirdassi did not "buy" anything for his $100,000 payment. When challenged by Kirdassi's counsel about the list of assets attached to the APA, the trial court noted that there was

no value on the items. Thus, the trial court concluded it could not quantify the value of Kirdassi's contractual interest or the injury to LSJC.

The court ultimately found "that a reasonable and fair amount of a judgment would be [$175,000]" against Scott for Kirdassi on breach of contract. When asked "how much for count one and how much for count two?" the trial court initially indicated that half of the judgment amount would go to each count. Later, the trial court clarified that it found the damages amount of $175,000 to Kirdassi alone. Although LSJC prevailed on Count I, the trial court did not award any damages. The trial court did not state its basis for the judgment amount of $175,000.

Kirdassi and LSJC's counsel challenged the trial court's finding against them on their conspiracy claim. The trial court stated that Kirdassi and LSJC did not establish by clear and convincing evidence that "there was any willful and wanton conduct" and that "wanton is the problem." Because Scott and Joshua did not transfer the Fairfax clinic with a "conscious disregard of [Kirdassi and LSJC's] rights," the court found that the claim failed. The parties later moved for reconsideration, but on April 28, 2023, the trial court entered an order denying the motions.

The trial court entered a final order on January 8, 2024.[5] The final order rendered judgment in favor of LSJC against Scott for Count I (breach of fiduciary duty), but the court awarded no damages. The claim against Joshua for breach of fiduciary duty was dismissed. The final order also rendered judgment in favor of Kirdassi against Scott for Count II (breach of

---

[5] On December 28, 2023, this Court ruled that the trial court's final order of judgment initially entered on January 25, 2023, was not a final order because it did not address and dispose of all the claims and parties in the case. *See Kirdassi v. White*, Record No. 0898-23-4 (Va. Ct. App. Dec. 28, 2023) (order). Thus, we dismissed the appeal as interlocutory. *See id.* After Plaintiffs and Defendants moved for entry of a final order consistent with this Court's ruling, the trial court entered the amended final order and judgment on January 8, 2024. It is from this valid final order that Kirdassi appeals.

contract) in the amount of $175,000.[6]  Otherwise, the trial court found in favor of Defendants on Count III (common law conspiracy), Count IV (statutory business conspiracy), and Count V (common law conversion) since, in its view, "[Kirdassi and LSJC] failed to carry their burden of proof on these three counts."  Kirdassi and LSJC appeal.

ANALYSIS

Collectively, the parties raise nine issues for appellate review, challenging, inter alia, the trial court's factual findings, application of the law, and characterization of the applicable burdens of proof.  In a bench trial, "[b]ecause the trial court heard the evidence *ore tenus*, its findings based on an evaluation of the testimony have the same weight as a jury verdict." *Cardinal Dev. Co. v. Stanley Constr. Co.*, 255 Va. 300, 302 (1998).  Thus, we examine the evidence in the light most favorable to the prevailing party at trial, and "we cannot set aside that judgment . . . 'unless it appears from the evidence that such judgment is plainly wrong or without evidence to support it.'"  *Moncrieffe v. Deno*, 76 Va. App. 488, 496 (2023) (quoting Code § 8.01-680).  "Whether the trial court applied the correct legal standard," however, is a question of law that we review de novo.  *Edmonds v. Edmonds*, 290 Va. 10, 18 (2015).  Thus, as it pertains to those assignments involving questions of burden of proof, we review the issues de novo.  *La Bella Dona Skin Care, Inc. v. Belle Femme Enters., LLC*, 294 Va. 243, 257 (2017).

Because each of the claims at issue on appeal stem from differing sources of authority for their actionability—e.g., whether from the Shareholders' Agreement governed by D.C. law, Virginia common law, or otherwise—we must first address the threshold question of which jurisdiction's law applies to which issues on appeal.

---

[6] The trial court sustained a demurrer on the claim against Joshua for Count II (breach of contract) before trial.

I. Conflict of Laws

"In choice-of-law cases, the forum state—here, Virginia—applies its own 'choice of law rules' to decide which state's law controls substantive issues." *Hazelwood v. Law. Garage, LLC*, 81 Va. App. 586, 595 (2024) (quoting *Dreher v. Budget Rent-A-Car Sys., Inc.*, 272 Va. 390, 395 (2006)). "If a contract specifies that the substantive law of another jurisdiction governs its interpretations or application, the parties' choice of substantive law should be applied." *Settlement Funding, LLC v. Neumann-Lillie*, 274 Va. 76, 80 (2007). Yet, in matters ex delicto, the law of the place where a wrong occurred—or the lex loci delicti—governs the substantive issues of tort liability. *Jones v. R.S. Jones & Assocs.*, 246 Va. 3, 5 (1993).

"The forum state applies its own law to ascertain whether the issue is one of tort or contract." *Buchanan v. Doe*, 246 Va. 67, 71 (1993). In distinguishing between matters arising ex contractu from those arising ex delicto, our Supreme Court has emphasized that:

> If the cause of complaint be for an *act of omission or non-feasance* which, without proof of a contract to do what was left undone, would not give rise to any cause of action (*because no duty apart from contract to do what is complained of exists*) then the action is founded upon contract, and not upon tort. If, on the other hand, the relation of the plaintiff and the defendants be such that a duty arises from that relationship, irrespective of the contract, to take due care, and the defendants are negligent, then the action is one of tort.

*Tingler v. Graystone Homes, Inc.*, 298 Va. 63, 81 (2019) (quoting *Richmond Metro. Auth. v. McDevitt St. Bovis, Inc.*, 256 Va. 553, 558 (1998)) (discussing the distinction between tort and contract actions in the context of the economic loss doctrine). Thus, a tort is a "legal wrong committed upon the person or property independent of contract," and a contract is "an agreement between two or more persons which creates an obligation to do or not to do a particular thing" independent of common law duties. *Buchanan*, 246 Va. at 72 (first quoting *Glisson v. Loxley*, 235 Va. 62, 67 (1988); and then quoting *Contract*, *Black's Law Dictionary* (6th ed. 1990)).

Further, statutory requirements affecting the performance of a contract become part of its terms just as if they had been incorporated in the contract in the first instance.  *Id.*

Whether breach of fiduciary duty is a cause of action ex delicto or ex contractu turns on the source of the duty at issue.  "[A]n action for the breach of contractually implied duties is still contractual in nature, notwithstanding the fact that such a breach may sound in tort."  *Crosby v. ALG Tr., LLC*, 296 Va. 561, 568 (2018) ("[B]reaches of fiduciary duty arising out of a contract 'while sounding in tort, are actions for breaches of the implied terms of [the] contract.'" (quoting *O'Connell v. Bean*, 263 Va. 176, 181 (2002))).  Thus, in *Crosby*, our Supreme Court determined that an action alleging breaches of fiduciary duties stemming from a deed of trust was nonetheless contractual in nature since "a deed of trust is a contract under the law."  *Id.*; *see also* Code § 55.1-320 ("Every deed of trust to secure debts or indemnify sureties is in the nature of a contract.").

In the corporate context, however, the law applicable to claims of breach of fiduciary duty centering around the actions of an officer or director in managing the internal affairs of a corporation is ordinarily determined by the internal affairs doctrine.  *VantagePoint Venture Partners 1996 v. Examen, Inc.*, 871 A.2d 1108, 1112 (Del. 2005).  "The internal affairs doctrine is a conflict of laws principle which recognizes that only one State should have authority to regulate a corporation's internal affairs—matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders."  *State Farm Mut. Auto. Ins. Co. v. Lopez*, 156 S.W.3d 550, 557 n.7 (Tex. 2004) (quoting *Edgar v. Mite Corp.*, 457 U.S. 624, 645 (1982)).  Virginia, however, has never formally adopted the internal affairs doctrine.

Indeed, Virginia statutes and case law lack any significant reference to the "internal affairs" of a corporation.  For example, the Virginia Stock Corporation Act provides for the provision of certificates of authority to foreign corporations to transact business in the

Commonwealth, but otherwise explicitly provides that it "does not authorize the Commonwealth to regulate the organization or internal affairs of a foreign corporation." Code § 13.1-761(C). Yet, the Act ostensibly contemplates that Virginia courts must resolve disputes involving the internal affairs of foreign corporations, insofar as it defines the term "[o]rganic law" as the "statute governing the internal affairs of a domestic or foreign corporation or eligible entity." Code § 13.1-603. The Act goes further by expressly providing for the application of the law of a corporation's state of incorporation when determining "whether the courts of the Commonwealth are a convenient forum." Code § 13.1-672.3.

As for precedent, our Supreme Court's only decision touching on this subject, *Taylor v. Mutual Reserve Fund Life Association*, 97 Va. 60 (1899), offers little guidance for the resolution of the present case. There, a claimant sought to (1) enjoin and restrain a life insurance company incorporated in New York from declaring his policy lapsed or forfeited; (2) require the company to permit the court to evaluate the "reasonable rate of assessment" to be paid by the claimant; (3) direct the company to accept the court's assessment rate; (4) require the company to disclose information about all policyholders; and (5) require the company to produce, in the Commonwealth, its "books, papers and vouchers." *Taylor*, 97 Va. at 66. The Court emphasized that:

> It seems to be well settled that courts will not interfere with the management of the internal affairs of a foreign corporation. Such questions are to be settled by the tribunals of the State which created the corporation. . . . Courts other than those of the State creating it, and in which it has its *habitat*, have no visitorial powers over such corporation, have no authority to remove its officers, or to punish them for misconduct committed in the State which created it, nor to enforce a forfeiture of its charter. Neither have they the power to compel obedience to their orders, nor to enforce their decrees.

*Id.* at 67. But the ratio decidendi of *Taylor* is inapposite to the facts of the present case. Unlike in *Taylor*, LSJC operated its business almost exclusively out of Virginia and its officers and

- 13 -

directors were all Virginia residents. The claim for breach of fiduciary duty at issue in this case sought money damages to compensate Virginia shareholders in a foreign corporation operating exclusively out of the Commonwealth, and not to enjoin the actions of a foreign corporation in a far-off State having no notable relationship with the Commonwealth.

To this point, in the more than 120 years since the pronouncement of *Taylor*, our Supreme Court has applied the law of the state of incorporation when resolving claims of breach of fiduciary duty asserted in the corporate context. *See, e.g.*, *Stockbridge v. Gemini Air Cargo, Inc.*, 269 Va. 609, 613 (2005) ("It is undisputed that because the controversy involves the internal affairs of the corporation, the laws of Delaware, the state of incorporation, apply.") (reversing trial court's grant of summary judgment in review of a claim brought under Del. Code Ann. tit. 8, § 160); *Fisher v. Tails, Inc.*, 289 Va. 69, 78 (2015) (determining that Delaware statutory law applied to determine whether shareholders were entitled to appraisal rights in a corporate transaction after the corporation changed its state of incorporation from Virginia to Delaware). The circuit courts have followed suit in the absence of controlling authority from this Court or the Supreme Court on resolving conflicts of law in this context, applying the law of the state of incorporation to derivative claims for breach of fiduciary duty.[7]

In this vein, we note that the jurisdictional facts of the present case are more akin to those of *Stockbridge* and *Fisher* than to those of *Taylor*. In *Stockbridge*, our Supreme Court applied Delaware law to resolve a dispute over the repurchasing of shares. 269 Va. at 613. The

---

[7] *See, e.g.*, *Westerman v. Allred*, Case No. CL-2006-457, 2008 Va. Cir. LEXIS 19, at *11-12 (Fairfax Feb. 20, 2008) (interpreting Code § 13.1-672.3 to require that derivative claims be governed by the laws of a foreign corporation's state of incorporation); *Parsch v. Massey*, 72 Va. Cir. 121, 122-23 (Charlottesville 2006) (interpreting Code § 13.1-672.3 and heeding the internal affairs doctrine as to derivative claims and lex loci delicti as to direct claims) ("Therefore, since Virginia is both the place of the wrong and the forum state, the Court will apply Virginia substantive and procedural law to the direct claim for fraud and the direct claim for breach of fiduciary duty.").

corporation in that case was incorporated in Delaware, but the chairman of its board of directors and its principal place of business were both located in Virginia. *Id.* In *Fisher*, the corporation at issue was originally incorporated under the laws of Virginia and held franchise rights for a Delaware limited liability company in the District of Columbia, Maryland, Virginia, and West Virginia. 289 Va. at 72. When the company at issue sought to engage in a multi-step corporate restructuring whereby the company would first reincorporate under the laws of Delaware, a sizeable minority of shareholders in Virginia sought appraisal rights for the proposed restructuring. *Id.* Our Supreme Court ultimately determined that Delaware law governed whether the shareholders enjoyed appraisal rights since the shareholders did not contest the restructuring until after the corporation was restructured. *Id.* at 73-78 ("Considering the various other transactions as one, and characterizing that transaction as a sale of all Tails' assets, does not change the statutes which dictate that Delaware law properly applied in determining whether the Minority Shareholders were entitled to appraisal rights.").

The palpable differences between the facts of *Stockbridge*, *Fisher*, and *Taylor* highlight the limits of the jurisdictional principles announced in *Taylor*. An indiscriminate application of the holding in *Taylor* to determine that Virginia courts lack jurisdiction to consider any claims of breach of fiduciary duty involving foreign corporations would miss the mark entirely. *Taylor* requires Virginia courts to consider the facts of each case, individually, to determine whether exercising jurisdiction over the foreign corporation would be inappropriate as an initial proposition. If, as in *Stockbridge* and *Fisher*, the foreign corporation at issue conducts business, maintains offices, and has its corporate leadership in the Commonwealth, then *Taylor* is inapplicable. And, in such cases, the law of the state of incorporation would apply to resolve the derivative claim of breach of fiduciary duty.

Here, LSJC's operation was almost entirely confined to the Commonwealth. To deny LSJC the opportunity to remedy the purported breaches of Scott and Joshua's fiduciary duties merely because LSJC is incorporated in Delaware would unnecessarily delay justice, hinder judicial economy in our sister State, and deny LSJC the opportunity to litigate its claim in the jurisdiction where the entirety of its peers are located. Hence, we determine that we have jurisdiction to consider LSJC's breach of fiduciary duty claim but that the laws of Delaware apply to its resolution.

As for their other claims, Kirdassi's claim for breach of contract is based on the Shareholders' Agreement, which is expressly governed by the laws of the District of Columbia; thus, issues relating to the adjudication of that claim will be reviewed under D.C. substantive law. Meanwhile, LSJC's conversion claim is based on conduct that Scott wrongfully exercised dominion and control over LSJC's property interests in the Fairfax clinic by transferring those interests to Joshua. This conversion claim constitutes an allegation of malfeasance, is a tort, and is governed by the lex loci delicti—here, Virginia law. Likewise, Kirdassi and LSJC's conspiracy claims are each based on conduct by Scott to purportedly "conspire[] and agree[]" with his sons, Joshua and Jesse, to fraudulently induce Kirdassi into making additional investments in LSJC based on inflated reports of LSJC's profitability. Again, these claims constitute allegations of malfeasance, are torts, and are governed by Virginia law.

Having determined the law applicable to each issue on appeal, we now turn to the merits of the parties' arguments.

II. Breach of Fiduciary Duty

Kirdassi and LSJC first argue that the trial court erred by failing to find that Joshua breached his fiduciary duties to LSJC in his capacity as managing employee of the Fairfax clinic by taking over that clinic without Kirdassi's knowledge or consent. By extension, Kirdassi and

LSJC argue that the trial court erred by failing to assess damages against Scott and Joshua for breach of fiduciary duty since, they contend, such an assessment is required by Delaware law. We agree.

Under Delaware law, "[a] claim for breach of fiduciary duty requires proof of two elements: (1) that a fiduciary duty existed and (2) that the defendant breached that duty." *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 601 (Del. Ch. 2010). "[C]orporate officers owe fiduciary duties that are identical to those owed by corporate directors." *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009) ("In the past, we have implied that officers of Delaware corporations, like directors, owe fiduciary duties of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."). Employees, on the other hand, are agents owing fiduciary duties to their employer. *Fisher v. Townsends, Inc.*, 695 A.2d 53, 58 (Del. 1997) ("Because all employers are [principals] and all employees are [agents], the terms employer/employee are often used interchangeably to denote a [principal/agent] relationship."). "As a general matter, '[a]gency is the fiduciary relationship that arises when a person (a "principal") manifests assent to another person that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Est. of Eller v. Bartron*, 31 A.3d 895, 897 (Del. 2011) (alteration in original) (quoting Restatement (Third) of Agency § 1.01 (2006)). "Under fundamental principles of agency law, an agent owes his principal a duty of loyalty, good faith, and fair dealing." *Kates*, 8 A.3d at 601.

"The duty of loyalty, in essence, 'mandates that the best interest of the corporation and its shareholders take precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally.'" *Benihana of Tokyo, Inc. v. Benihana, Inc.*, 891 A.2d 150, 191 (Del. Ch. 2005) (quoting *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993)). "The classic example that implicates the duty of loyalty is

when a fiduciary either appears on both sides of a transaction or receives a personal benefit not shared by all shareholders." *Id.* (quoting *In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 751 (Del. Ch. 2005)). "[T]he duty of loyalty proscribes a fiduciary from any means of misappropriation of assets entrusted to his management and supervision." *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 848 (Del. Ch. 2022) (quoting *U.S. West, Inc. v. Time Warner, Inc.*, 1996 Del. Ch. LEXIS 55, at *21 (June 6, 1996)). Indeed, "[a]n agent has a duty 'not to use property of the principal for the agent's own purposes or those of a third party.'" *Id.* (quoting Restatement of Agency § 8.05(1)).

Here, the trial court expressly found that Scott breached his fiduciary duties to the corporation, and this finding is not at issue on appeal. As for Joshua, Kirdassi and LSJC asserted that he breached his duty of loyalty by "conspiring with his father, Scott White to transfer corporate assets and customer lists to himself." Without making explicit findings as to Joshua's liability, the trial court found that:

> [T]here was a clear breach of the corporate documents in the sale and transfer. I don't think it came close to complying with what the documents required in that circumstance, and I do think that [Scott] transferred it, and I do think he transferred it with some personal benefit that he got from it in the sense that [Joshua] benefitted, but aside from that, he didn't have to declare bankruptcy which he didn't want to do and he had the leases taken up and off of the personal guarantees, the personal guarantees were wiped out, and that clearly was something that was to his individual benefit and not to the benefit . . . not only to the benefit of the corporation, which at that point he had to act for the benefit of the corporation and not in his own interest.

Despite this, the trial court's final order reflects that the breach of fiduciary duty claim against Joshua was dismissed, without explanation.

The record reflects the undisputed fact that Joshua began working for LSJC at the time of its formation in 2016. Joshua testified that he was an integral part of LSJC's operations, and regularly reported sales data to Kirdassi at Kirdassi's request. As an employee of LSJC, Joshua

was an agent of LSJC owing duties of "loyalty, good faith, and fair dealing." *Kates*, 8 A.3d at 601. In spite of these duties, Joshua entered into an agreement with Scott—without the consent of Kirdassi—to "take over the Fairfax [clinic]," in exchange for assuming the past-due rent obligations owed by LSJC at that location. Scott transferred the lease for the Fairfax clinic to Joshua, and Joshua used his access to LSJC's patient lists to operate his new corporation. Following the transfer, Joshua maintained his access to LSJC's patient database until the time of trial, and for six months used LSJC's bank account for his new business. Certainly none of these facts were lost on the trial court, as it found Joshua benefitted from the transfer of LSJC's interests in the Fairfax clinic, to the detriment of LSJC itself.

The trial court made no factual findings and received no evidence suggesting that Joshua participated in the transfer of the Fairfax clinic as a matter of respecting Scott's wishes as his father or as part of a transaction mutually consented to between Joshua and LSJC. Instead, the uncontroverted evidence in the record reflects that Joshua "purchased [the Fairfax clinic] by paying the back rent and the leases." Joshua's testimony reflects that he was not compelled to accept the transfer of the Fairfax clinic by Scott and that he purchased the Fairfax clinic with full knowledge of the fact that he would be usurping the clinic from LSJC:

> What [Joshua] was told was if [he] paid the back rent, assumed the leases, assumed the patient care that had already been paid for because in our business, the initial payment happens on the first or second visit with the patient starts up. There's no more money within that patient afterwards. So [Joshua] was told if [he] assumed that entire patient base so that [the patients] were not out their money and they would not then sue the company, so if [he] assumed all of those liabilities, then yes, [he] could take over the Fairfax office.

In short, Joshua agreed to accept the transfer of the Fairfax clinic in consideration for his acceptance of significant liability and without LSJC's consent or Kirdassi's knowledge. The facts reflect that Joshua did not innocently receive some benefit from Scott by virtue of the

transfer of the Fairfax clinic: he was a confessed willing participant in the usurpation of the clinic from LSJC. By occupying "a position of trust and confidence toward" LSJC, Joshua was subject to more stringent fiduciary obligations than the average employee. *Brophy v. Cities Serv. Co.*, 70 A.2d 5, 7 (Del. Ch. 1949). Hence, by knowingly engaging in a transaction to usurp the Fairfax clinic without LSJC's consent with the express goal of using LSJC's confidential patient lists and proprietary information gained through his employment by LSJC, and thereafter entering into direct competition with LSJC, Joshua necessarily breached his fiduciary duty of loyalty to LSJC. *Cf., e.g.*, *Lazard Debt Recovery GP, LLC v. Weinstock*, 864 A.2d 955, 967 (2004) ("[A]n agent can make arrangements or plans to go into competition with his principal before terminating his agency, provided no unfair acts are committed or injury done his principal." (quoting *Sci. Accessories Corp. v. Summagraphics Corp.*, 425 A.2d 957, 963 (Del. 1980))); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 521 (S.D.N.Y. 2011) ("When an employee uses an employer's proprietary or confidential information when establishing a competing business, the employee breaches his or her fiduciary duty to the employer.").

Under Delaware law, these facts reflect the "classic example that implicates the duty of loyalty" since Joshua "receive[d] a personal benefit not shared by [LSJC]." *Benihana*, 891 A.2d at 191 (quoting *In re Walt Disney Co.*, 907 A.2d at 751). LSJC entrusted Joshua to manage and supervise the assets of the Fairfax clinic—including the leasehold interest, any other leased chattels at the clinic, and its patient databases—and he breached his duty of loyalty by misappropriating and asserting control over those assets in contravention of LSJC's interests. *See Harron*, 275 A.3d at 848. The record is devoid of any evidence that could lead to a different result. As such, the trial court's dismissal of the breach of fiduciary duty claim against Joshua is certainly "plainly wrong" and "without evidence to support it." *Moncrieffe*, 76 Va. App. at 496.

Setting aside the trial court's error in failing to find that Joshua breached his fiduciary duty of loyalty to LSJC, the trial court otherwise awarded no damages to LSJC on its finding that Scott breached his duty of loyalty because it "did not find sufficient credible evidence to support valuation of [the Fairfax clinic]." The trial court misapprehends Delaware law. "Public policy will not permit an employee occupying a position of trust and confidence toward his employer to abuse that relation to his own profit, regardless of whether his employer suffers a loss." *Brophy*, 70 A.2d at 8. "[T]he absence of specific damage to a beneficiary is not the sole test for determining disloyalty by one occupying a fiduciary position." *Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) (discussing proof required to sustain a claim for breach of the fiduciary duty of loyalty in a Delaware nonstock corporation). "Once disloyalty has been established, the standards evolved in [*Oberly v. Kirby*] . . . require that a fiduciary not profit personally from his conduct, and that the beneficiary not be harmed by such conduct." *Thorpe v. CERBCO*, 676 A.2d 436, 445 (Del. 1996).

Put differently, once a breach of the fiduciary duty of loyalty has been proven, Delaware courts will award at least nominal damages, unless the claimant carries their burden of proving the existence of further damages. *In re Tri-Star Pictures*, 634 A.2d 319, 334 n.18 (Del. 1993) ("If plaintiffs seek more than nominal damages arising out of their claim . . . the Court would expect that plaintiffs' present hypothetical estimates will give way to the more generally accepted practice of offering expert testimony on the amount of damages actually suffered by the class."). This is because "[t]he strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Thorpe*, 676 A.2d at 445. To this end, the Delaware Court of Chancery has opined that:

> "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly." Damages must be "logically and reasonably related to the harm or injury for which compensation is being awarded." But as long as that

- 21 -

connection exists, "[t]he law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack m[a]thematical certainty are permissible so long as the court has a basis to make a responsible estimate of damages." "[O]nce a breach of duty is established, uncertainties in awarding damages are generally resolved against the wrongdoer."

*In re Dole Food Co., S'holder Litig.*, 2015 Del. Ch. LEXIS 223, at *150 (Aug. 27, 2015) (alterations in original) (first quoting *Thorpe*, 676 A.2d at 445; then quoting *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006); then quoting *Red Sail Easter Ltd. Partners v. Radio City Music Hall Prods., Inc.*, 1992 Del. Ch. LEXIS 224, at *7 (Sept. 29, 1992); and then quoting *Thorpe v. CERBCO, Inc.*, 1993 Del. Ch. LEXIS 257, at *12 (Oct. 29, 1993)). By finding Scott liable for breach of fiduciary duty, the court did not heed the "strict imposition of penalties under Delaware law" for Scott's disloyalty, *Thorpe*, 676 A.2d at 445, and erred by failing to award damages, even if only nominal.

As a result of the trial court's errors in failing to find Joshua liable for breach of the duty of loyalty and failing to award damages on its finding of liability on Scott's breach, we remand these issues to the trial court for (1) a hearing on the amount of damages, even if only nominal, owed to LSJC based on the foregoing breaches of the duty of loyalty, and (2) further proceedings as to Joshua's liability for breach of fiduciary consistent with this opinion.[8]

III. Breach of Contract

Next, Kirdassi and LSJC argue that the trial court erred by failing to award the full amount of damages they believe Kirdassi was owed—$288,827.82 instead of the $175,000 awarded—on their breach of contract claim against Scott. They contend that the trial court

---

[8] *See Penick v. Ratcliffe*, 149 Va. 618, 638 (1927) ("Ordinarily when good pleas are rejected and good instructions refused, the appellate court, after pointing out the errors, will remand the case for a new trial to be had in accordance with the views expressed. But when there is no dispute as to the facts and the issues are in law only, and when they have been fully argued and maturely considered, such procedure is wholly unnecessary.").

improperly excluded from its award of damages the $100,000 Kirdassi paid for half of the assets in the McLean clinic as contemplated by the APA. Likewise, they assert that the trial court expressly misstated and misunderstood the amount of Kirdassi's initial investment in LSJC, tallying it at $168,000 rather than $188,827.82. They argue that the APA and SPA were integral to the Shareholders' Agreement, and by finding a breach of contract without awarding the value owed to Kirdassi as agreed upon by the parties in their contracts, the trial court erred. We agree.

The trial court entered judgment in favor of Kirdassi on his breach of contract claim, awarding $175,000 on that claim. In so finding, the trial court found that Scott breached the Shareholders' Agreement, causing the injury at issue. Explaining its damages award, the trial court found that Kirdassi "ultimately invested . . . a hundred and sixty-eight thousand dollars" in LSJC by virtue of his initial investment and "bought the McLean [clinic] for a hundred thousand dollars." Although the parties agreed that the value of one-half of the assets—including all "intellectual property" such as "trademarks, websites and domain names"—of the McLean clinic was $100,000, the trial court nonetheless expressed disbelief at this agreed-upon and negotiated valuation:

> I've listened to the evidence and I don't see how there was two
> hundred thousand dollars worth in McLean anywhere because
> everything was leased, the real equipment was leased, so I don't
> know what he was buying for the hundred thousand. I think he
> viewed it as an investment but it is a purchase agreement.

Hence, the trial court declined to award the $100,000 in additional damages because it could not "quantify" the value of the McLean clinic.

The Shareholders' Agreement provides, among other things, that

> [t]he officers shall keep or cause to be kept complete and accurate
> books and records of the Corporation . . . includ[ing] . . . true and
> full information regarding the amount of cash and a description
> and statement of the agreed value of *any* other property or services
> contributed by each Shareholder.

- 23 -

(Emphasis added). The Agreement further provides that Kirdassi and Scott "acknowledge that it is impossible to measure in money the damages that would result by reason of a party's breach" and provides for a broad range of available remedies in the event of a breach.

The trial court found that "there was a clear breach of the corporate documents in the sale and transfer" of the Fairfax clinic. Kirdassi and LSJC argue that in assessing damages, however, the trial court wholly misstated Kirdassi's initial investment in LSJC and erred by denying Kirdassi damages for his investment under the APA in purchasing 50% of the assets in the McLean clinic.

We review the trial court's interpretation of the provisions of the Shareholders' Agreement de novo. *TM Delmarva Power v. NCP of Va.*, 263 Va. 116, 119 (2002). "Whether the language of a contract is ambiguous is a question of law that we review de novo." *Preferred Sys. Sols., Inc. v. GP Consulting, LLC*, 284 Va. 382, 391 (2012). "The standard of review for a damages calculation has been framed as whether there were 'sufficient facts' to support the award." *Id.* at 399 (quoting *Nichols Constr. Corp. v. Va. Mach. Tool Co.*, 276 Va. 81, 89 (2008)). "The plaintiff bears the 'burden of proving with reasonable certainty the amount of damages and the cause from which they resulted,' but the 'specific amount of the loss or damage' does not need to be proven 'with absolute certainty.'" *MCR Fed., LLC v. JB&A, Inc.*, 294 Va. 446, 461 (2017) (first quoting *Shepherd v. Davis*, 265 Va. 108, 125 (2003); and then quoting *Condo. Servs. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc.*, 281 Va. 561, 577 (2011)).

As noted, the Shareholders' Agreement is governed by the laws of the District of Columbia. Under the laws of the District of Columbia, "where a contract's 'language is clear and unambiguous, its plain language is relied upon in determining the parties' intention.'" *Wash. Inv. Partners of Del., LLC v. Sec. House*, 28 A.3d 566, 573 (D.C. 2011) (quoting *GLM P'ship v.*

*Hartford Cas. Ins. Co.*, 753 A.2d 995, 998 (D.C. 2000)).  "[A] written contract duly signed and executed speaks for itself and binds the parties without the necessity of extrinsic evidence." *Beck v. Cont'l Cas. Co.*, 936 A.2d 747, 751 (D.C. 2007) (quoting *Cameron v. USAA Prop. & Cas. Ins. Co.*, 733 A.2d 965, 968 (D.C. 1999)).  "The first step in contract interpretation is determining what a reasonable person in the position of the parties would have thought the disputed language meant." *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 190 (D.C. 2009) (quoting *Intercounty Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32 (D.C. 1982)).

The Shareholders' Agreement, by its plain language, clearly contemplated the keeping of records pertaining to all capital contributions made to LSJC, as well as any unliquidated contributions to the corporation.  By its terms, such records would reflect a "statement of the agreed value" of any such contributions.  The APA, in tandem, reflects that Kirdassi purchased the 50% interest in the McLean clinic's assets with the intention that such assets would be used in the "operation" of the McLean clinic—one of the first clinics in LSJC's operations.  As a record of one of Kirdassi's non-capital contributions to LSJC, the Shareholders' Agreement therefore provides that the "agreed value" of Kirdassi's contributed share of the McLean clinic was the $100,000 purchase price Kirdassi paid to acquire his interest.

In finding the value of Kirdassi's investment in LSJC not adequately proven, the trial court disregarded the contractual agreement that Kirdassi's $100,000 purchase *was* sufficient consideration for his interest in LSJC.  The Shareholders' Agreement spoke for itself to this effect and bound "the parties without the necessity of extrinsic evidence." *Beck*, 936 A.2d at 751 (quoting *Cameron*, 733 A.2d at 968).  Moreover, by accepting the shareholders' intent that Kirdassi's purchase of the McLean clinic assets was an "investment" while nonetheless characterizing the purchase as merely tangential, the trial court ignored the parties' intention.  Such intention, under D.C. law, serves as the basis for review of any breach of contract claim.

*Tsintolas*, 984 A.2d at 190. In so doing, the trial court erred in its calculation of the damages owed to Kirdassi.

The trial court further erroneously found that Kirdassi ultimately only invested $168,000. "[F]actual findings will not be disturbed on appeal unless they are plainly wrong or without evidence to support them." *Collins v. First Union Nat'l Bank*, 272 Va. 744, 749 (2006). The record reflects the uncontroverted fact that Kirdassi's investments totaled $188,827.82 beyond the asset purchase. By finding that Kirdassi only invested $168,000 in LSJC, the trial court's finding was "plainly wrong" and "without evidence" in support thereof and was therefore in error. *Id.* Hence, we remand this matter for a hearing on the proper amount of damages on the breach of contract claim.[9]

IV. Conversion

Kirdassi and LSJC further argue that the trial court erred by requiring LSJC to prove "conscious disregard or reckless indifference in order to recover compensatory damages against Scott and Joshua White for conversion." We agree.

"Conversion is 'any wrongful exercise or assumption of authority . . . over another's goods, depriving him of their possession; [and any] act of dominion wrongfully exerted over property in denial of the owner's right, or inconsistent with it.'" *Arch Ins. Co. v. FVCbank*, 301 Va. 503, 523 (2022) (alteration in original) (quoting *Mackey v. McDannald*, 298 Va. 645, 659 (2020)). In other words, to make a claim for conversion, a plaintiff must prove two elements by

---

[9] Defendants assign cross-error to the trial court's award of compensatory damages to Kirdassi on the breach of contract claim asserting that Kirdassi failed to demonstrate that his damages were proximately caused by Scott's actions. "The doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" *Commonwealth v. Swann*, 290 Va. 194, 196 (2015) (quoting *McGhee v. Commonwealth*, 280 Va. 620, 626 n.4 (2010)). Because we reverse the trial court's judgment on the issue of damages for the breach of contract claim and remand the matter for a new hearing on that issue, we decline to consider the merits of Defendants' first cross-error.

a preponderance of the evidence: "(i) the ownership or right to possession of the property at the time of the conversion and (ii) the wrongful exercise of dominion or control by defendant over the plaintiff's property, thus depriving plaintiff of possession." *Gordon v. Pete's Auto Serv. of Denbigh, Inc.*, 838 F. Supp. 2d 436, 440 (E.D. Va. 2012) (quoting *Airlines Reporting Corp. v. Pishvaian*, 155 F. Supp. 2d 659, 664 (E.D. Va. 2001)). "Any distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights, or inconsistent therewith, may be treated as a conversion." *Condo Servs.*, 281 Va. at 574 (quoting *Universal C.I.T. Credit Corp. v. Kaplan*, 198 Va. 67, 75 (1956)). While proof of damages is not an element of conversion, "the measure of damages, as a general rule, is the value of the property converted at the time and the place of conversion." *Straley v. Fisher*, 176 Va. 163, 167 (1940).

In ruling on LSJC's conversion claim, the trial court ruled:

> I also think the conversion count fails. I think the actions that were taken were . . . could be construed as conversion, but I don't think that there was evidence to establish a conscious disregard or reckless indifference to the rights of Mr. Kirdassi.

As an initial matter, the trial court misunderstood the conversion claim entirely: the claim was brought derivatively on behalf of LSJC, not by Kirdassi himself.[10] Put differently, the question presented to the court below was whether Defendants wrongfully exercised dominion over LSJC's property in a manner inconsistent with LSJC's rights. By failing to find that Defendants converted LSJC's property, the trial court ignored the uncontroverted evidence in the record: that Scott and Joshua wrongfully transferred the Fairfax clinic without unanimous consent of the board of directors in contravention of the Shareholders' Agreement. Indeed, the trial court explicitly found that "there was a clear breach of the corporate documents in the sale and

---

[10] As pleaded, the first amended complaint explicitly describes the conversion claim as a "Derivative Claim on Behalf of LSJC" and describes only harm incurred by LSJC, rather than by Kirdassi individually.

transfer" of the Fairfax clinic. In effectuating the wrongful transfer of the Fairfax clinic, Scott and Joshua also transferred the chattels therein, including the "chairs, computers . . . lasers . . . [and the] decompression tables." The fact that the property purported to have been converted was leased is immaterial to whether Scott and Joshua could be liable for conversion. *See Simmons v. Miller*, 261 Va. 561, 582 (2001) (affirming judgment for conversion where the plaintiff presented evidence that the defendant "deprived [plaintiff] of the use and value of its property, including the lease of office space, furniture, equipment, cash and customer lists").

To the extent that the trial court declined to find that conversion occurred based on its misstatement of the burden of proof applicable to the claim, the trial court erred. "Under Virginia law, there is no 'requirement under the basic conversion cause of action to show intentionality, willfulness, venality, or any other mental state of the defendant.'" *McCants v. CD & PB Enters., LLC*, 303 Va. 19, 27 (2024) (quoting Kent Sinclair, *Sinclair on Virginia Remedies* § 12-2, at 12-8). Once "[a]ny distinct act of dominion wrongfully exerted over the property of another, and in denial of his rights" is proven, *Condo Servs.*, 281 Va. at 574 (quoting *Kaplan*, 198 Va. at 75), "the plaintiff is entitled to recover, irrespective of good or bad faith, care or negligence, knowledge or ignorance," *McCants*, 303 Va. at 27 (quoting *Kaplan*, 198 Va. at 76). Thus, LSJC was under no obligation to prove that Scott and Joshua acted with a "conscious disregard or reckless indifference." The trial court erroneously increased the burden of proof in this respect.

Therefore, we remand these proceedings for a hearing to determine, in light of the proper burden of proof against which LSJC's evidence must be measured, whether Scott and Joshua are liable for conversion, and for what damages they may be liable, if any.

V. Statutory Business Conspiracy[11]

Finally, Kirdassi and LSJC argue that the trial court erred by failing to find that Scott and Joshua are liable for statutory business conspiracy since Kirdassi and LSJC contend they proved all of the requisite elements of the cause of action. They further contend that the trial court improperly required that they prove that Scott and Joshua's actions were "willful and wanton." We disagree.

Claims alleging a statutory business conspiracy are governed by Code § 18.2-499, which provides:

> Any two or more persons who combine, associate, agree, mutually undertake or concert together for the purpose of (i) willfully and maliciously injuring another in his reputation, trade, business or profession by any means whatever or (ii) willfully and maliciously compelling another to do or perform any act against his will, or preventing or hindering another from doing or performing any lawful act . . . [shall be subject to civil liability under Code § 18.2-500].

---

[11] Kirdassi and LSJC also contest the trial court's finding that they failed to carry their burden in proving that Scott and Joshua committed common law conspiracy by forming together to breach their fiduciary duties or convert the Fairfax clinic. "A common law conspiracy consists of two or more persons combined to accomplish, by some concerted action, some criminal or unlawful purpose or some lawful purpose by criminal or unlawful means." *Gelber v. Glock*, 293 Va. 497, 533 (2017) (quoting *Comm'l Bus. Sys., Inc. v. BellSouth Servs., Inc.*, 249 Va. 39, 48 (1995)). "The foundation of a civil action of conspiracy is the damage caused by the acts committed in furtherance of the conspiracy." *Id.* (quoting *Comm'l Bus. Sys.*, 249 Va. at 48). "[A] common law claim of civil conspiracy generally requires proof that the underlying tort was committed." *Id.* at 534 (quoting *Almy v. Grisham*, 273 Va. 68, 80 (2007)). Unlike in the statutory business conspiracy context, a claim for common law conspiracy does not require proof that the alleged tortfeasors acted with malice. *See Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214-15 (2014).

The trial court heavily based its finding that Kirdassi and LSJC failed to carry their burden of proof on common law conspiracy on their failure to prove that Joshua breached his fiduciary duties or that Scott and Joshua converted the Fairfax clinic. Because we hold that the trial court erred in failing to find Joshua liable for breach of fiduciary duty and in improperly increasing the burden of proof on conversion, the trial court must necessarily reconsider its holding on common law conspiracy as well. This Court will not, therefore, opine on the propriety of the trial court's analysis for common law conspiracy. *See Abdo v. Commonwealth*, 64 Va. App. 468, 473 n.1 (2015) ("Our jurisprudence requires us to seek 'the best and narrowest ground available' for our decision." (quoting *Armstead v. Commonwealth*, 56 Va. App. 569, 576 (2010))).

To recover for statutory business conspiracy, "a plaintiff must establish: '(1) a combination of two or more persons for the purpose of willfully and maliciously injuring plaintiff in his business[;] and (2) resulting damage to plaintiff.'" *Dunlap v. Cottman Transmission Sys., LLC*, 287 Va. 207, 214 (2014) (alteration in original) (quoting *Allen Realty Corp. v. Holbert*, 227 Va. 441, 449 (1984)). "Moreover, '[i]n order to sustain a claim for this statutory business conspiracy, the plaintiff must prove by clear and convincing evidence that the defendants acted with legal malice, that is, proof that the defendants acted intentionally, purposefully, and without lawful justification, and that such actions injured the plaintiff's business." *N. Va. Real Est., Inc. v. Martins*, 283 Va. 86, 110 (2012) (alteration in original) (quoting *Williams v. Dominion Tech. Partners, LLC*, 265 Va. 280, 290 (2003)).

Here, the trial court found that Kirdassi and LSJC "failed to carry their burden of proof" to establish statutory business conspiracy. In its ruling, the trial court noted:

> I think on the conspiracy counts, both common law and statutory, I don't think the plaintiff has carried its burden to establish by clear and convincing evidence that a conspiracy occurred. . . . I think it's also almost as likely that what happened was [Scott and Joshua] were scrambling and trying to find ways to deal with their precarious circumstance and I do think that probably [Scott] asked his sons to communicate things and I think they communicated them in a good light, which was problematic, but I don't think that that really was sufficient to establish that [Kirdassi] took any actions in reliance on those.

Kirdassi and LSJC's conspiracy claims were based on Scott and Joshua's actions in allegedly "provid[ing] false information to Kirdassi that overstated LSJC's profitability and sales" in February 2017, and "transfer[ring] to Joshua LSJC's Fairfax clinic" in June 2018. To this end, the trial court received evidence and heard testimony that by February 2017, Kirdassi and Scott's relationship had deteriorated and that Kirdassi had significantly pulled away from the affairs of LSJC. While Scott and Jesse reported to Kirdassi around the same time that the clinics "ha[d] become profitable," Jesse had been in communication with Kirdassi as early as November 2016

- 30 -

regarding the potential need for closing certain clinics. As for the June 2018 transfer of the Fairfax clinic, Scott and Joshua were faced with eviction; when Kirdassi did not answer his phone, Scott and Joshua took matters into their own hands to salvage the business.

On these facts, we cannot say that the trial court's finding that Kirdassi and LSJC failed to carry their burden in proving statutory business conspiracy was plainly wrong or without evidence in support thereof. Neither in February 2017 nor in June 2018 did Scott and Joshua act "for the purpose of willfully and maliciously injuring [Kirdassi and LSJC]." *Dunlap*, 287 Va. at 214. This is not to say that their conduct did not culminate in the commission of certain torts; rather, they did not set out to commit these torts with legal malice. "[T]he gist of the civil action of conspiracy is the damage caused by the acts committed in pursuance of the formed conspiracy and not the mere combination of two or more persons to accomplish an unlawful purpose or use unlawful means." *Id.* (quoting *Gallop v. Sharp*, 179 Va. 335, 338 (1942)). The trial court could have reasonably concluded that the purpose of Scott and Joshua's actions was to salvage the business, rather than to cause injury to LSJC. While they ultimately caused harm to LSJC and Kirdassi's interests therein, the fact remains that they acted with the purpose of preserving LSJC's assets and safeguarding both Scott and Kirdassi's interests in the success of the business.

And although the trial court reasoned that Scott and Joshua effectuated the transfer "intentionally to try and benefit themselves," the trial court's reasoning in this regard cannot be read to suggest that Scott and Joshua acted intentionally, purposely, and without lawful justification to cause harm to LSJC. To the contrary, the trial court made numerous findings of fact indicating that while Scott and Joshua enjoyed certain benefits as a result of the improper transfer of the Fairfax clinic, they took such actions intentionally and purposely to salvage the business and to "deal with their precarious circumstance," and not to injure Kirdassi or LSJC. "[F]actual findings will not be disturbed on appeal unless they are plainly wrong or without

evidence to support them." *Collins*, 272 Va. at 749. Because the record is replete with evidence in support of the trial court's finding that Scott and Joshua did not intentionally, purposely, and without lawful justification cause harm to LSJC or Kirdassi's interest therein, we decline to reverse the trial court's finding to this effect. By extension, we decline to reverse the trial court's finding in favor of Scott and Joshua on Kirdassi and LSJC's statutory business conspiracy claim.

Kirdassi and LSJC point to the trial court's remarks that the evidence failed to establish that "there was any willful and wanton conduct . . . and . . . you need that as well." The trial court opined that it believed the conspiracy claims failed because

> wanton is the problem, and that's where that language comes in about . . . that I mentioned about reckless indifference and conscious disregard. I don't think they were doing it in conscious disregard of [Kirdassi's] rights. I think they were doing it intentionally to try and benefit themselves but not . . . not really to damage him. So I don't think it meets the burden.

Ultimately, the trial court's ruling reflected its understanding that Scott and Joshua lacked the necessary legal malice to sustain Kirdassi and LSJC's claim of statutory business conspiracy, and the trial court properly based its conclusion that the statutory business conspiracy count failed on this determination.

Thus, even if the trial court had hung its hat on its understanding that conspiracy claims require a showing that the alleged tortfeasors acted willfully and with reckless indifference and a conscious disregard for the rights of the injured party, the court below nonetheless reached the right result. "[A]n appellate court may affirm the judgment of a trial court when it has reached the right result for the wrong reason." *Debroux v. Commonwealth*, 32 Va. App. 364, 371 (2000) (quoting *Driscoll v. Commonwealth*, 14 Va. App. 449, 452 (1992)). "Consideration of the facts in the record and whether additional factual presentation is necessary to resolve the newly-advanced reason is the proper focus of the application of the doctrine." *Banks v. Commonwealth*, 280 Va. 612, 617 (2010) (quoting *Perry v. Commonwealth*, 280 Va. 572, 580

(2010)). As already discussed at length *supra*, the trial court's factual finding that Scott and Joshua did not act with legal malice was not plainly wrong or without evidentiary support. Hence, no additional facts are necessary for this Court's decision, and therefore, "the record provides an adequate foundation for the Court to decide the issue on this basis." *Holloman v. Commonwealth*, 65 Va. App. 147, 159 n.4 (2015).

VI. Defendants' Remaining Assignments of Cross-Error

Having considered each of the issues raised by Kirdassi and LSJC, we now turn to Defendants' assignments of cross-error. Defendants argue that the trial court erred in "not finding that Mr. Kirdassi breached his fiduciary duties to make sure the Company kept proper accounting records," "not finding that Mr. Kirdassi failed to mitigate his damages," and "in not finding that Dr. Scott White is entitled to offset his contributions for any damages due to Mr. Kirdassi." Across these three assignments of cross-error, Defendants cite to a total of three authorities on brief.

Rule 5A:21(e) requires an appellee's brief to contain "[t]he standard of review, the argument, and the authorities relating to each assignment of cross-error." "Unsupported assertions of error 'do not merit appellate consideration.'" *Bartley v. Commonwealth*, 67 Va. App. 740, 744 (2017) (quoting *Jones v. Commonwealth*, 51 Va. App. 730, 734 (2008)). "We require adherence to this rule because '[a] court of review is entitled to have the issues clearly defined and to be cited pertinent authority. The appellate court is not a depository in which the appellant may dump the burden of argument and research.'" *Id.* (alteration in original) (quoting *Jones*, 51 Va. App. at 734). "To ignore such a rule by addressing the case on the merits would require this court to be an advocate for, as well as the judge of the correctness of, [appellant's] position on the issues he raises." *Id.* (quoting *Jones*, 51 Va. App. at 734-35).

"Simply put, '[i]t is not the role of the courts, trial or appellate, to research or construct a litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or her contention or merely constructs a skeletal argument, the issue is waived.'" *Blankenship v. Commonwealth*, 71 Va. App. 608, 623 n.2 (2020) (alteration in original) (quoting *Bartley*, 67 Va. App. at 746). "Appellate courts are not unlit rooms where attorneys may wander blindly about, hoping to stumble upon a reversible error." *Fadness v. Fadness*, 52 Va. App. 833, 851 (2008).

We find that Defendants' failure to develop these arguments in compliance with Rule 5A:21 is significant. Accordingly, we treat these assignments of error as waived and do not consider them. *See Parks v. Parks*, 52 Va. App. 663, 664 (2008).

## CONCLUSION

For the foregoing reasons we affirm the trial court's holding that Scott White breached his fiduciary duty to LSJC, breached the contract with Kirdassi, and its finding that Scott and Joshua White were not liable for statutory business conspiracy. We reverse and remand these proceedings, however, for: (1) a hearing on (i) the amount of damages owed on LSJC's breach of fiduciary duty claim, and (ii) the amount of damages owed on the breach of contract claim; (2) further proceedings consistent with this opinion on LSJC's claim against Joshua, given our holding that Joshua has breached his fiduciary duty to LSJC; (3) a hearing on Scott and Joshua's liability for conversion, including a determination of any damages they may be liable therefor, if necessary; and (4) a hearing to determine whether, based on this Court's determination that Joshua is liable for breach of fiduciary duty, and the trial court's conclusions as to conversion, Scott and Joshua should be held liable for common law conspiracy.

*Affirmed in part, reversed in part and remanded*.